IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 21, 2002 Session

## HUNTINGTON ELDRIDGE, JR. v. DEBORAH MARIE WEST ELDRIDGE

**Direct Appeal from the Circuit Court for Shelby County**
**No. 159705-3 R.D.     Karen R. Williams, Judge**

**No. W2000-00730-COA-R3-CV - Filed August 8, 2002**

Husband filed for divorce alleging inappropriate marital conduct and irreconcilable differences. Wife countersued on the same grounds. After a lengthy trial, the court awarded Husband the divorce. Wife appeals several aspects of the court's decision, including the distribution and classification of the parties' property, child support, and alimony. Wife also contends that the court was biased against her and created an appearance of impropriety. Husband also raises issues on appeal. We affirm in part, reverse in part, and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part;**
**Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and FRANKLIN MURCHISON, SP.J., joined.

Kay Farese Turner, Melissa C. Berry, and Sam B. Blair, Jr., Memphis, Tennessee, for the appellant, Deborah Marie West Eldridge.

Wanda B. Shea, Lisa E. Circeo, and George Lawrence Rice, III, Memphis, Tennessee, for the appellee, Huntington Eldridge, Jr.

### OPINION

Huntington Eldridge, Jr. (Husband) and Deborah Marie West Eldridge (Wife) were married on June 11, 1983. At the time of the marriage, Wife owned a business in Chicago, Illinois. Husband worked for Ducks Unlimited and owned a substantial amount of separate assets. The couple had two minor children at the time of the divorce.

In 1993, the parties moved to Memphis in conjunction with Husband's employment. The couple's marriage, which had been stormy from the outset, began to suffer increasing difficulties. Husband and Wife separated, and thereafter, Husband filed for a divorce. In his complaint, Husband

alleged that Wife was guilty of inappropriate marital conduct and alleged that irreconcilable differences existed between the parties. Wife alleged the same grounds in her counter-complaint. Each party sought custody of the minor children.

The matter came to trial on October 25, 1999 and lasted until December 6, 1999. The court granted Husband the divorce on the grounds of inappropriate marital conduct. After the court's ruling, the parties filed several post trial motions contesting various aspects of the court's decision. The court handed down its final post trial ruling on March 3, 2001. This appeal followed.

Wife raises several issues for our review. Within many of these issues, Wife lists other sub-issues. We will list Wife's central issues and address the sub-issues in turn. These issues, as stated by Wife, are as follows:

I.      Whether the conduct of the Trial Court demonstrated by the evidentiary, procedural and ethical errors constituted bias against Wife and created the appearance of impropriety that tainted the Trial Court's rulings on each issue in this case and to the extent to require reversal and reassignment of [the] case to another trial court in [the] event of remand . . . .

II.     Whether the Trial Court erred in the division of marital property and marital debt . . . .

III.    Whether the Trial Court erred in the calculation and award of child support, both direct and indirect, for the parties' two minor children . . . .

IV.     Whether the Trial Court failed to make the proper award of alimony and order Husband to secure a life insurance policy to guarantee his alimony obligation.

V.      Whether the Trial Court failed to properly weigh each party's relative fault in the breakup of the marriage and erred in granting the divorce to Husband on the grounds of inappropriate marital conduct.

VI.     Whether the Trial Court erred in assessing all of Wife's attorney fees and all court costs in the case against Wife when Wife stipulated on the record that both parties were entitled to a divorce on grounds but Husband refused to so stipulate and proceeded with four weeks' worth of cumulative evidence at trial on Wife's fault calculated for Wife's harassment, embarrassment and financial ruin.

VII.    Whether the Trial Court erred by its failure to rule that the Order of Pendente Lite Support should have remained in effect until [the] entry of the Final Decree of Divorce on June 26, 2000.

To the extent these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *e.g., Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). We may not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. *Id.* With respect to the court's legal conclusions, our review is *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). Further, we give great weight to the factual findings of the trial court which rest on determinations of witness credibility. *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). Accordingly, absent clear and convincing evidence to the contrary, we will not re-evaluate a trial judge's assessment of witness credibility. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

### *The Conduct of the Trial Court*

In Wife's first issue, she contends that the trial court was biased against her and that the case should be reversed due to the trial court's appearance of impropriety. Wife supports her argument by raising numerous sub-issues regarding various events, actions and decisions that took place during the trial of this matter.

At the outset, we restate one of the core principles of our jurisprudence: "all litigants have a right to have their cases heard by fair and impartial judges." *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). A trial judge must not only be impartial in fact, but must also be perceived to be impartial. *Id.* Accordingly, even if a trial judge believes that he or she can hear a case fairly and impartially, the judge is vested with the responsibility to recuse "himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Tenn. S. Ct. R. 10, Canon 3(E)(1); *Kinard*, 986 S.W.2d at 228.

Initially, the judge has the duty to determine whether recusal is warranted in a particular case. *Kinard*, 986 S.W.2d at 228. These decisions are discretionary, unless otherwise mandated by the Tennessee Constitution or by statute. *Id. See* Tenn. Const. Art 6 § 11; Tenn. Code Ann. § 17-2-101 (1994). A judge must be objective when making his or her determination. *Kinard*, 986 S.W.2d at 228. Thus, when parties challenge a judge's impartiality, they "must come forward with some evidence that would prompt a reasonable, disinterested person to believe that the judge's impartiality might reasonably be questioned." *Davis v. Dep't of Employment Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999).

The "objective view" of a judge's conduct is characterized by two important limitations. *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998). In order to disqualify a judge, the bias or prejudice must come from an extrajudicial source and not result from the judge's impressions during trial. *Id.* If this were not the case, a judge who makes a ruling adverse to one of the parties would be subject to charges of bias and prejudice. *Id.* Indeed, "adverse rulings by a trial court are not usually sufficient grounds to establish bias. Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Alley v. State*, 882 S.W.2d 810, 821-

22 (Tenn. Crim. App. 1994) (citations omitted); ***But see Hoalcraft v. Smithson***, No. M2000-01347-COA-R10-CV, 2001 Tenn. App. LEXIS 489, at *50-54 (Tenn. Ct. App. July 10, 2001) (***no perm. app. filed***) (stating that the cumulative effect of the trial judge's "repeated misapplication of fundamental, rudimentary legal principles in ways that favored Mr. Smithson substantively and procedurally" prompts an objective concern regarding the judge's impartiality).

The other limitation concerns the judge's background experience. ***Wilson***, 987 S.W.2d at 562. Disqualification is not warranted when the judge's impersonal prejudice arises from the judge's background experience. ***Id.*** Judges will generally have strong feelings about certain conduct and behavior. ***Id.*** "When the judge perceives that one party or the other has engaged in that conduct, the party should not be surprised that he/she has incurred the judge's wrath." ***Id.***

Parties may lose the right to challenge a judge's impartiality if they do not file recusal motions soon after the facts forming the basis of the motion become known. ***Id.*** The frequently cited rule that "a party must complain and seek relief immediately after the occurrence of a prejudicial event and may not silently preserve the event as an 'ace in the hole' to be used in the event of an adverse decision," applies in cases where a party challenges a judge's impartiality. ***Gotwald v. Gotwald***, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988); ***see also Davis***, 23 S.W.3d at 313; ***Kinard***, 986 S.W.2d at 228. Accordingly, the failure of a party to seek the recusal of a judge in a timely manner results in a waiver of the issue. ***Davis***, 23 S.W.3d at 313.

Before addressing the merits of Wife's first issue, we must first address the timeliness of Wife's concerns regarding the trial judge's alleged bias and appearance of impropriety. Wife failed to question the trial judge's impartiality by filing a motion to recuse during the trial of this matter. The first time Wife raised the issue is in this appeal. After reviewing Wife's various allegations in support of her issue, it is clear that Wife was aware of the events that she alleges took place at trial before she filed her final notice of appeal on March 7, 2001. This compels the conclusion that Wife "purposely decided to use the impartiality issue as [her] 'ace-in-the-hole' in the event that [she] lost the [trial] on the merits." ***Davis***, 23 S.W.3d at 313. As we have previously stated, "[c]ourts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting known grounds for disqualification in order to 'experiment with the court . . . and raise the objection later when the result of the trial is unfavorable.'" ***Kinard***, 986 S.W.2d at 228 (citation omitted). Therefore, any argument concerning the trial court's alleged bias or impropriety in this case is waived and must necessarily be viewed with skepticism.

Even though Wife's issue regarding the alleged bias and appearance of impropriety of the trial court is waived as untimely, we will address the merits of Wife's issue in order to foster and preserve the public's confidence in judicial neutrality. ***See Davis***, 23 S.W.3d at 313. Wife attempts to illustrate, through several allegations, that the court maintained some bias against her and, at least, created an appearance of impropriety that would justify the disqualification of the trial judge. In Wife's first allegation regarding the bias of the trial court, she maintains that the court accepted an ex parte communication from Husband in the form of a computer disc that contained a proposed final decree, Husband's closing argument, and other matters related to this and other cases. Wife

states that she thought that Husband's proposed final order was the sole item on the disc and that she only learned about the additional items after the trial court's final order. Wife contends that this is "material to the consideration of bias and 'appearance of impropriety' standard."

Wife did not argue at trial that this constituted an appearance of impropriety or biased the trial court. In fact, Wife expressly represented to the trial court that she was not concerned with the court's use of the disc. The record reveals the following:

> Wife's Counsel: . . . In fact, there were more things on [the disc] relative to Eldridge, and that the point to what we're saying.
>
> The Court: All right. But I will tell you on the record I didn't open anything on that disk and use it except the proposed order. I saw that there were other files on it. I didn't use them . . . .
>
> Wife's Counsel: Your Honor, I want to - - there may be a misperception. When you say that you didn't open a single file except that one, that's the end of the inquiry as far as this side of the counsel table is concerned. I don't know how else to say it any better than that; but as it relates to you, that's the end of it.
> Now, I don't want you to think any different than that, because you said something about an inference or something or another. When you said that, that's - - you opened the only file, that's the only one you opened. I'm saying that for Ms. Turner, Ms. Berry, and myself and I'm sure everybody else. So I don't want you to think anything other than that, none of us do; and please understand that, because that's important to all of us here.

From this exchange, it is evident that Wife chose not to raise an issue with the trial court regarding it's handling of the disc. Further, this evidence fails to prompt a reasonable person to question the impartiality of the trial court. The court's handling of the disc fails to warrant the recusal of the trial judge.

Next, Wife contends that the "trial court should have recused itself because Husband's counsel served as co-chairperson of her re-election campaign." In support of her position, Wife cites the case of **Collier v. Griffith**, No. 01-A-01-9109-CV-00339, 1992 Tenn. App. LEXIS 245 (Tenn. Ct. App. March 11, 1992) (**no perm. app. filed**). In that case, we stated that the trial court erred by failing to recuse itself because "opposing counsel was serving as the finance chairman of the trial judge's re-election campaign . . . ." **Id.** at *19. We did not, however, hold that recusal in such instances was mandatory. **Id.** at *17-18. We held that the circumstances in that case were "sufficient to cause a reasonable person to harbor doubts about the trial judge's impartiality. Thus the trial judge should have recused himself from the case **when Mr. Collier requested that he do so.**" **Id.** at *19 (emphasis added).

Initially, we are compelled to point out that Wife failed to bring this matter before the trial court. Wife maintains that she served a Motion to Disqualify Larry Rice as Counsel upon Husband's counsel and the trial court, where she cited the appearance of impropriety standard of Canon 2 of the Code of Judicial Conduct. Wife candidly admits that she "did not file her Motion to Disqualify Larry Rice as Counsel out of professional courtesy for counsel and Judge Williams."[1] Therefore, the only item in the record concerning this issue is Husband's "Response to Motion to Disqualify Larry Rice as Counsel for Plaintiff." Husband's motion provides the following:

> Plaintiff admits that attorney Larry Rice served as co-chairperson for the re-election campaign of Karen Williams. However, Plaintiff alleges that Mr. Rice and Mr. Caywood organized the raising of funds to retire post election debt of Judge Williams from her previous campaign. Mr. Caywood similarly served on the campaign re-election committee, comprised of twelve other people, for Judge Williams, before whom this matter is pending.

Attached to the motion was the affidavit of James Bingham. In the sworn affidavit, Mr. Bingham states that "Mr. Rice served as campaign co-chair for Karen R. Williams, Circuit Judge. Mr. Caywood and Ms. Turner also assisted Judge Williams in her re-election campaign."[2]

Because the trial court's decision in hearing the case is discretionary, we must presume that the decision is correct. **Overstreet v. Shoney's Inc.**, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). Despite the fact that Wife failed to file a motion to recuse the trial judge because of the judge's relationship with Husband's counsel, we find no error with the trial court's decision to hear this case. We find it particularly insightful that counsel for both parties served in the trial judge's campaign. With that in mind, we cannot say that Husband's counsel's efforts in the trial judge's campaign would prompt a reasonable person to question the trial judge's impartiality.

Next, Wife asserts that the trial court conducted ex parte communications with Husband's counsel. In support of her claim, Wife relies on the following exchange:

> The Court: Eldridge versus Eldridge, 159705. I don't have any of your pleadings. They can't be found because your case is on appeal. I don't have any jurisdiction. . . . .
>
> Mr. Blair: . . . I'm going to raise an issue that I'm very uncomfortable with, but I need to raise it. This case is brand new to me, and I'm representing the defendant in this

---

[1]Apparently, Wife chose not to exercise this courtesy on appeal as she asserts that the trial judge's failure to recuse herself, or in the alternative, to disqualify Husband's counsel is reversible error. As we stated above, this Court frowns on the manipulation of the impartiality issue to gain a procedural advantage when the trial result was unfavorable to one of the parties.

[2]Ms. Turner represented Wife throughout the divorce proceedings. Mr. Caywood also represented Wife during a portion of the proceedings. Mr. Caywood, however, later withdrew as counsel.

case and trying to get this case prepared for the appeal and have that appeal proceed. This case has been a very difficult case for the parties and the Court and the lawyers. There have been a lot of accusations, there have been a lot of problems, and I'm just - - I'm just - - a new player, but I'm very concerned.

There has been no response to our motion filed, and I walk into court today and I hear Mr. Rice talking with your clerk and he's suggesting to the clerk that the motion shouldn't be heard because there is no jurisdiction because the case is on appeal. Your Honor comes on the bench and says exactly that, and that - -

The Court: (Interposing.) Do you think that I don't have an independent view of this case?

Mr. Blair: Your Honor, I'm very uncomfortable with this. I wanted to express my thoughts, Your Honor.

The Court: That has been a problem throughout this case. I have never seen such distrust between a group of lawyers. You're looking at things under the bed that aren't there.

Mr. Blair: I understand that, and I wanted the Court to know that I saw what occurred. I'm sure the Court can assure us that it didn't occur.

The Court: I can assure you that I had the thought in my mind last night when I read this docket for today and said why is this case on my list when it's on appeal?

Mr. Blair: I just needed to raise that.

The Court: Would you like to move on to a new issue? Are you satisfied with that?

Mr. Blair: Your Honor, I had to raise it. I told you I was uncomfortable. You made the statement - -

The Court: (Interposing.) Let's go on.

Mr. Blair: All right. Lets go on . . . .

Wife contends that the trial court's decision regarding jurisdiction was influenced by ex parte communications between the court's clerk and Husband's attorney. Wife maintains that such a conclusion is reasonable in light of the above exchange. We disagree. In light of the trial judge's explanation and lack of any other evidence in the record to suggest to the contrary, a reasonable person would not be prompted to question the trial court's impartiality based on Wife's assertions. Wife's inferences are tenuous at best; we find this allegation without merit.

Next, Wife contends that "[t]he Trial Court followed case law cited by Husband's counsel that was not applicable to the facts of this case, and the holding[s] of which were misrepresented to the Court and contrary to Husband's position." There is simply no evidence of this in the record. At trial, Husband's counsel stated that "[t]he Western Section Court of Appeals as recently as 1999 in Bradfield versus City of Memphis said that ultimately the Tennessee Supreme Court declined to adopt a rule that would allow a case to be pending in more than one court at a time." Wife relies on this statement as evidence of her assertions regarding Husband's counsel's misrepresentations. The Bradfield case cited by Husband states exactly as Husband represented to the court. *Bradfield v. City of Memphis*, No. 02A01-9808-CV-00220, Tenn. Ct. App. LEXIS 580, at *10 (Tenn. Ct. App. Aug. 24, 1999) (*no perm. app. filed*). This issue is without merit.

Next, Wife alleges that the trial court accepted documents under seal from Husband's counsel without disclosing the documents to Wife. Wife further alleges that the trial court denied the receipt of the documents. Wife contends this conduct is evidence of the trial court's bias against her and creates the appearance of impropriety.

To support her contention, Wife states that she discovered a folder containing trust documents within a box consisting of the trial record. Wife states that the trial judge prevented discovery of these particular trust documents and appointed Joe Duncan, an attorney, to review the documents in order to report their contents to the court. The trial judge indicated at trial that she "never saw Barbara B. Eldridge TTEEUA two, slash, ten, slash, ninety-six trust." Wife contends that this was the very trust contained in the folder. Wife also alleges that Husband's attorney's attorney admitted to sending documents under seal to the trial judge that were not in the record.

Wife failed to cite to, nor can we locate, any evidence in the record to support Wife's allegations. Again, Wife "must come forward with some evidence that would prompt a reasonable, disinterested person to believe that the judge's impartiality might reasonably be questioned." *Davis,* 23 S.W.3d at 313. We have found no such evidence, and Wife did not seek to develop evidence to support her claim.[3] This issue is without merit.

Wife also complains that "[t]he [c]ourt's failure to properly maintain the trial record and refusal to release the complete trial record to the Shelby County Circuit Court Clerk's office for preparation for appeal also illustrates the judge's misconduct in this matter." Again, Wife cites no evidence, nor can we find any, that would support her claims. This was a lengthy trial with a substantial record. Even if evidence did exist to support Wife's contention that the "[c]ourt kept the record in utter disarray," it would not prompt a reasonable person to question the judge's impartiality. This issue is without merit.

---

[3]As we stated in *Schoen v. J.C. Bradford & Co.*, 642 S.W.2d 420, 427 (Tenn. Ct. App. 1982), we are "not under a duty to minutely search a voluminous record to verify numerous unsupported allegations." The trial record consisted of seventy-three volumes of trial transcript and 185 exhibits.

Finally, Wife alleges that the trial court's bias is evidenced by certain procedural and evidentiary errors made by the court. Wife contends that the following actions by the trial court constituted bias and created the appearance of impropriety. According to her brief, Wife states these actions as follows:

(1) The Trial Court limited Wife's requests for discovery relative to a $2.3 million transfer from the Barbara B. Eldridge 2/10/96 Trust when Husband not only has a beneficial present possessory interest in the trust but also is a beneficiary and trustee of the trust.

(2) The Trial Court entered three Final Decrees of Divorce in this cause and subsequently orally modified them.

(3) The Trial Court adopted opposing counsel's proposed ruling and made it Court's February order, despite the fact that this ruling did not conform to proof at trial.

(4) The Trial Court failed to recognize the conflict in permitting Joe Duncan to serve as Guardian Ad Litem, while drafting Husband's will and later serving as Special Master to review trust documents in camera.

As we stated earlier, adverse rulings by a trial judge against one of the parties, even if erroneous, are not grounds for the disqualification of the trial judge.[4] The fact that Wife may be dissatisfied with some of the judge's decisions is not enough to illustrate bias. Wife must show that the decisions were motivated by bias that stemmed from an extrajudicial source; the decisions by the trial court in this case cannot stand alone as evidence that would lead a reasonable person to conclude that the court was impartial.

### *Distribution of Property*

Wife raises several points of error regarding the trial court's classification and distribution of the parties' property. Trial courts are vested with a great deal of discretion when classifying and dividing the marital estate, and their decisions are entitled to great weight on appeal. *Goodman v. Goodman*, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999). Accordingly, unless the court's decision is contrary to the preponderance of the evidence or is based on an error of law, we will not interfere with the decision on appeal. *Id.*

Before we address Wife's concerns regarding the court's classification of the parties' property, it is helpful to review some well-established principles of our divorce jurisprudence. In an action for divorce, Tennessee, as a "dual property" state, draws a distinction between separate and

---

[4]Wife also argues that the trial court erred in making these rulings. However, the issue, as presented, is whether the trial court was biased against Wife and whether the court's decisions created the appearance of impropriety. Wife's attempts to persuade us that the decisions were erroneous cannot be used to illustrate the impartiality of the trial court.

marital property. ***Batson v. Batson***, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). Because the Tennessee statutes only allow for the division of marital property upon the dissolution of a marriage, it is of primary importance for the trial court to classify property as separate or marital. Tenn. Code Ann. § 36-4-121(a)(2001); ***Brock v. Brock***, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996). Therefore, because separate property is not subject to division in an action for divorce, the trial court must initially determine the nature of the parties' property. ***Watters v. Watters***, 959 S.W.2d 585, 588 (Tenn. Ct. App. 1997); ***Brock***, 941 S.W.2d at 900.

The General Assembly defines "separate property" as:

> (A) All real and personal property owned by a spouse before marriage;
> (B) Property acquired in exchange for property acquired before the marriage;
> (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);
> (D) Property acquired by a spouse at any time by gift, bequest, devise or descent;
> (E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and
> (F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2) (2001). Further, the Tennessee legislature provides the following definitions for "marital property" in a divorce action:

> (1)(A) "Marital Property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing a complaint for divorce. . . .
> (B) "Marital Property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.
> (C) "Marital Property" includes recovery in personal injury, workers' compensation, social security disability actions, and other similar actions for the following: wages lost during the marriage, reimbursement for medical bills incurred and paid with marital property, and property damage to marital property.

Tenn. Code Ann. § 36-4-121(b) (2001).

This Court has recognized instances where separate property can become part of the marital estate due to the parties' treatment of the separate property. The doctrines of transmutation and commingling provide an avenue where separate property can become marital property. ***Hofer v. Hofer***, No. 02A01-9510-CH-00210, 1997 Tenn. App. LEXIS 74 at *8-9 (Tenn. Ct. App. Feb. 3, 1997) (***no perm. app. filed***) (citing ***Pope v. Pope***, No. 88-58-II, 1988 WL 74615, at *3 (Tenn. Ct. App. 1988)); ***Batson***, 769 S.W.2d at 858. This Court has previously defined transmutation as follows:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

***Batson***, 769 S.W.2d at 858 (quoting 2 H. Clark, ***The Law of Domestic Relations in the United States*** § 16.2 at 185 (1987)). The related doctrine of commingling concerns instances where separate property becomes marital property when the separate property is inextricably mingled with marital property or the other spouse's separate property. ***Hofer,*** 1997 Tenn. App. Lexis 74, at *8. Commingling does not occur if the separate property can be traced into its product or if the separate property continues to be segregated. ***Id.***

First, Wife contends that the court erred in classifying certain real property as a combination of marital and separate property. At issue is property located at 404 North Greenbay, Lake Forest, Illinois. With the intent of moving from Memphis and back to Lake Forest, Illinois, the couple acquired this property in 1997 for 1.675 million dollars. Husband paid over 1.2 million dollars of this purchase price up front and took out a mortgage on the remainder. The 1.2 million dollar down payment represented a portion of a 2 million dollar gift from Husband's mother to Husband. The mortgage document shows, and the parties agree, that the house was jointly titled in the names of each spouse.

The parties never moved into the Greenbay residence nor did they spend a great deal of time there. Despite the couple's planned additions to the house, it was largely left unimproved. A trust, referred to as the Huntington Eldridge, Jr. Trust by the parties, paid for the remaining mortgage on the home.

The trial court found that the fair market value of the home was 1.9 million dollars. After determining that the house contained 1.674 million dollars in equity, the court awarded 1.2 million

dollars to Husband as his separate property. The court ruled that the remaining $474,000 was marital property and awarded it to Husband as part of his share of the couple's marital estate.

Wife contends that the trial court erred in classifying 1.2 million dollars of the house's equity as Husband's separate property. Wife states that there is a rebuttable presumption that Husband made a gift to the marital estate when the couple assumed joint title to the property. Because Husband failed to rebut this presumption, Wife states that the trial court should not have classified the 1.2 million dollars at issue as Husband's separate property. We agree with Wife.

We have examined this issue in several cases. In *Barnhill v. Barnhill*, 826 S.W.2d 443 (Tenn. Ct. App. 1991), Husband acquired $60,000 from his father which the trial court properly recognized was separate property. Husband used the $60,000 to purchase a tract of land, and Husband titled the land in both his and Wife's names. *Id.* at 452. Wife argued that the doctrine of transmutation applied, and we agreed. *Id.* We stated that "[b]y assuming title in joint tenancy, there exists a rebuttable presumption the Husband made a gift to the marital estate. There was no intent evident in the record that Husband intended that this property remain separate." *Id.* (citation omitted).

In *Feather v. Feather*, No. 01A01-9704-CH-00183, 1998 Tenn. App. LEXIS 233 (Tenn. Ct. App. Apr. 3, 1998) (*no perm. app. filed*), we held that the wife in that case successfully rebutted the presumption of a gift to the marital estate when the marital home was jointly titled in the couple's names and partly paid for with the wife's separate funds. We ruled that communications between the husband and wife clearly indicated an intent that the wife's property remain separate. *Id.* at *27. The husband testified as follows:

A. She had the intent she stated of keeping that property separate from me.

Q. All right. Because it has relevance under the rules we've talked about, I'll just ask you specifically, did you agree with your wife that that $24,000 from her inheritance would be considered a part of her separate property?

A. Yes, I agreed to that.

*Id.* We concluded that the record supported the trial court's finding that the $24,000 remained the wife's separate property. *Id.*

When Husband's mother gave him a gift of 2 million dollars, the gift was Husband's separate property. When Husband applied 1.2 million dollars of this gift toward the purchase of the Greenbay house and titled it in the names of both spouses, however, Husband created a rebuttable presumption of a gift to the marital estate.[5] From our review of the record, Husband failed to rebut this

___

[5]Husband argues that the parties must have treated the home as a "family home" in order for the rebuttable
(continued...)

-12-

presumption. We can find no evidence in the record that clearly indicates Husband's intent to keep the 1.2 million dollars as separate property. Husband did not state that he intended to keep the property separate in his testimony. Instead, Husband stated that "[w]e purchased [the house] in February, 1997." This statement indicates that Husband considered both himself and Wife as co-purchasers of the home. Husband relies heavily on circumstances to defeat the presumption including the fact that the parties did not move to the residence, that they did not spend much time at the residence, and that they did not improve the residence. Husband further notes that Wife's marital misconduct caused the parties to terminate their move. These circumstances do not illustrate that Husband intended to keep the 1.2 million dollars as his separate property and will not defeat the presumption in this case. Husband's intent was to use the home as the couple's residence when he made the down payment. Husband's testimony establishes that the parties intended to move back to Lake Forest and use the Greenbay residence as their home. The fact that the couple never used the house as intended is of no effect, because this does not clearly indicate Husband's intent to keep the property separate. Additionally, Husband was aware that he and Wife were having marital difficulties when he purchased the home.

We hold that the trial court erred by classifying a portion of the equity in the home as Husband's separate property. The trial court should have classified all of the equity in the house, 1.674 million dollars, as marital property. Accordingly, the 1.2 million dollars the court awarded to Husband is part of the marital estate, not Husband's separate property as found by the trial court.

Next, Wife states that "[t]he [c]ourt classified portions of Husband's pre-marital investment accounts as separate property when proof at trial showed that Husband had inextricably commingled separate and marital monies in these accounts, which included stocks and bonds, transmuting their nature from separate to marital property." Wife maintains that the court erred in classifying the accounts as "mixed assets." Wife contends that the court should have concluded that the accounts were marital property subject to equitable division.

At the time of the divorce, Husband maintained two large investment accounts. These were the William Blair Account and the Smith Barney Account. Husband kept these accounts in his name throughout the marriage. Wife was not listed as a joint owner on the accounts, did not have access to the accounts, and did not write checks on the accounts.

Husband opened the William Blair Account in 1984. At the time of trial, the account had a balance of over 1.5 million dollars. The account contained a large portion of separate funds, including funds Husband acquired via various gifts and inheritances. During the latter years of the marriage, Husband deposited marital funds into the account. These deposits were $500,000 in

[5](...continued)

presumption to arise. We disagree. The case law is unambiguous – if separate funds are used to purchase property which is jointly titled in the couple's names, a rebuttable presumption of transmutation exists.

proceeds from the sale of the parties' jointly owned residence, the repayment of a $25,000 loan, and an additional deposit of $6,500.[6]

Husband's Smith Barney Account also had a value of approximately 1.5 million dollars at the time of the divorce proceedings. This account contained funds that Husband acquired prior to his marriage, funds that Husband received as gifts, and funds that Husband inherited. Additionally, this account contained deposits as a result of Husband's work for his mother.[7] The deposits from Husband's employment were from 1996 to 1998 and totaled $234,000.

To complicate matters, Husband used a marital account, the Northern Trust Account, as a "conduit account." Husband would deposit both marital funds and separate funds into this account. Husband would transfer money between the William Blair and Smith Barney Accounts and the Northern Trust Account. Husband would also write checks and transfer money to its ultimate destination from this marital account.

Both parties provided experts who testified regarding the above accounts. Husband's expert testified that he was able to determine the source of each deposit in the investment accounts at issue. Husband's expert further testified regarding the withdrawals from the investment accounts. The expert testified that he was able to trace the withdrawals from the investment accounts to their ultimate destination. Finally, Husband's expert testified that he was able to match each deposit with its corresponding withdrawal.

Wife's expert provided testimony that conflicted with Husband's expert's conclusions. Wife's expert testified that he failed to find any facts which would lead him to conclude that Husband tried to keep marital funds isolated from Husband's separate funds. The expert emphasized the interaction between the marital account, Northern Trust, and the William Blair and Smith Barney accounts. Wife's expert focused on the significant activity within the different accounts and determined that the accounts had been inextricably commingled.

The court ruled that the William Blair Account had a value of $1,526,874. The court classified this as a mixed asset, and awarded $235,000 to Husband as separate property. The court divided the remainder equally between the parties. Regarding the Smith Barney Account, the court ruled that it had a value of $1,488,494. The court also classified this account as a mixed asset and awarded $525,000 to Husband as separate property. The court divided the remainder equally between Husband and Wife.

---

[6]Wife contends that Husband deposited employment earnings into the account. Other than a flow chart introduced by Wife's expert, nothing in the record supports this assertion. Further, Wife's expert's findings and analysis regarding the William Blair Account fail to support Wife's claim.

[7]Husband earned a salary for assisting his mother with her financial affairs. (Exh. 17).

The trial court made no factual findings to support its rulings regarding the accounts. After a thorough review of the record, we can find no evidence to support the trial court's findings. Accordingly, we must determine the preponderance of the evidence from the record without a presumption of correctness afforded to the trial court's ruling. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Realty Shop, Inc. v. RR Westminster Holding, Inc*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Wife insists that each account is marital property, while Husband contends that the accounts are each his separate property. We have determined that each account is marital property, as the separate funds have been inextricably commingled with marital property.

When Husband combined his separate funds with the couple's marital funds, he jeopardized the identity of his separate funds. In order for Husband to prevent his separate funds from becoming marital property, Husband had to illustrate that the separate property was not *inextricably* mingled with the couple's marital property. Husband could accomplish this by demonstrating that the property continued to be segregated or by demonstrating that the separate funds could be traced into their product. From our review of the record, Husband failed to accomplish this task.

First, Husband admits that he did not keep the separate funds in the two accounts segregated. The separate funds were often used to pay expenses and purchase marital property.[8] Husband used separate funds for these purposes while marital funds were in the account. Additionally, Husband claimed to use separate funds in conjunction with marital funds when paying expenses and purchasing marital property. However, from our review of the record, we cannot say with any certainty that the marital funds left the account with the separate property. The marital funds may very well have remained in the accounts. This is due to the fact that Husband could not clearly match the marital deposits with their ultimate destination. If the marital deposits could not be matched to their destination, we must conclude that the accounts were inextricably commingled.

Second, Husband's expert testified that he failed to account for the investment activity within the account. When marital property within the account earned money, the earnings were not treated as distinct from the earnings from the separate property. Although the expert testified that the marital investment earnings were relatively small compared to the separate property investment earnings, we cannot discount the fact that marital property contributed to the growth of this account.

Husband argues that the outflow of money toward marital expenses outweighed any deposits or earnings that could be classified as marital property, so the remaining funds must be his separate property. This argument fails to demonstrate that the funds were not commingled. Any argument based on tracing must be more certain. After Husband combined the marital and separate property,

---

[8]Husband argues that our decision in *Avery v. Avery*, No. M2000-00889-COA-R3-CV, 2001 Tenn. App. LEXIS 487, at *29, n.12 (Tenn. Ct. App. July 11, 2001) (*no perm. app. filed*), precludes us from examining his use of his separate funds in our analysis. There, we stated that "it would be bad policy for a court to hold that a party risks all of his or her separate property by spending some of it for the benefit of his or her family." *Id.* The facts in that case are distinguishable from the facts in the present case. In *Avery*, the husband did not deposit marital funds with his separate funds. Here, Husband combined the two classes of property, and his use of the separate property is relevant to determine whether he kept the separate property segregated in order to retain its identity.

he had the obligation to establish that the two sources of funds were not inextricably commingled. Husband cannot accomplish this task by merely relying on the fact that the marital withdrawals outweighed the marital deposits.

Husband contends that we must examine his intent. Husband argues that the commingling of the funds did not result in the transmutation of his separate property to marital property because he has rebutted the presumption of commingling by evidence establishing that the accounts were in his name only and that Wife had no access to the accounts. Husband's intent is irrelevant at this point. Once marital funds were *inextricably* commingled with separate funds, we can no longer look to Husband's intent regarding those separate funds. At this point, it is impossible to determine what portion of Husband's funds remained separate, even if he had the intent to keep the funds separate.

We hold that the William Blair and Smith Barney investment accounts were inextricably commingled. Accordingly, the entire balance of these accounts is properly classified as marital property. As these accounts are investment accounts, we remand this issue to the trial court to determine their respective values.

Wife next argues that the court erred in its treatment of the Huntington Eldridge, Jr. 2/1/97 Trust. Wife contends that any increase in the value of the trust is marital property. Additionally, Wife contends that Husband converted the trust into a marital asset by withdrawing from the trust to pay marital expenses. Regarding the trust, the court determined that "Husband has no present possessory interest in the . . . Huntington Eldridge, Jr. Trust and therefore, declines to classify or divide [it]."

The trust was established by a 2 million dollar contribution from Husband's mother. Kent Chandler, Jr. and Jerry Jones are the independent trustees of this trust. Only the independent trustees may, in their discretion, distribute the income and principal from the trust. The independent trustees have the obligation to preserve the trust's assets for all of the members of the class of beneficiaries. The beneficiaries of this trust are Husband and his descendants. At the time of the trial, the trust was valued at 3.3 million dollars. Since the inception of the trust, the independent trustees have paid the mortgage payments and the property taxes on the Greenbay residence owned by Husband. Husband listed these distributions on his affidavit of income and expenses. Mr. Jones testified that Husband was without any present possessory interest in the trust.

We examined a similar situation in *Tower v. Tower*, 02A01-9407-CV-00170,1995 Tenn. App. LEXIS 720, (Tenn. Ct. App. Nov. 3, 1995) (*no perm. app. filed*). There, the wife received monthly income from a trust. *Id.* at *7. The trial court classified a portion of the trust as the wife's separate property, despite the uncontradicted testimony that established that the wife had no present possessory interest in the trust. *Id.* We reversed the trial court, holding that the trial court erred in classifying a portion of the trust as the wife's separate property because there was no evidence that the wife had a present possessory interest in the trust. *Id.* at *14.

The present case is analogous to *Tower*. Testimony established that Husband was without any present possessory interest in the Huntington Eldridge, Jr. 2/1/97 Trust. Further, our review of the trust document leads us to the same conclusion. Accordingly, the trial court was correct in refusing to classify the trust as Husband's separate property.

In her next sub-issue, Wife states that the court erred in finding that the parties' club memberships have no value. Wife's entire argument in support of this contention is as follows: "[i]t is ludicrous to consider the Court's division of these clubs (7 to Husband and 1 to Wife) is equitable. It is also ludicrous that the Court found that the club memberships have no value." Wife fails to cite any evidence in the record that would justify her conclusions. This issue is without merit.

Next, Wife argues that the court erred in ruling that Wife dissipated a portion of her William Blair investment account. In support of Wife's assertion, she cites to the court's February 28, 2000 order.[9] This was not the court's final order. In its final order, the court ruled that the account was a marital asset and valued the account at $350,574. This valuation is supported by Wife's October 1999 William Blair statement. The court awarded the entire amount of the account to Wife and did not state that Wife dissipated funds from the account. Accordingly, this issue is without merit.

Wife contends that the trial court erred by assigning the "majority of the marital debt to Wife." When addressing the parties' marital debts, the court awarded the debt associated with the parties' two residences to the person who received the residence. The remainder of the debt was associated with Wife's credit cards. The record establishes that Wife charged a great deal of money to these cards from January 1998 to September 1999. The court found that Wife spent large sums of money on frequent trips and extravagances during the marriage and during the period of separation. After a review of the record, we conclude that the evidence does not preponderate against the trial court's assignment of the couple's marital debt. This issue is without merit.

Finally, Wife contends that the trial court erred in its equitable distribution of marital property. Husband also argues that the court erred in its distribution. In light of our decision regarding the classification of the parties' property, we must remand the case for another equitable distribution in accordance with section 36-4-121 of the Tennessee Code.

### Child Support

Wife's next issue concerns the trial court's award of child support. The parties entered into a permanent custodial plan that declared Wife to be the two minor children's custodial parent. The

---

[9]Aside from citing the February order, Wife's brief provides little guidance on the issue.

court then determined Husband's child support obligations.[10]  In awarding Wife child support, the court stated as follows:

> The Court finds that Husband has shown that an amount greater than thirty-two percent (32%) of his net income in excess of $18,000 per month exceeds a reasonable amount of child support based upon the best interest of the children and the circumstances of the parties.  The children have large trusts [sic] accounts that can be called upon to meet their educational and other needs.  Therefore, Husband shall pay child support to Wife in the amount of $5,760 per month . . . .

Wife argues that the trial court erred in its calculation of Husband's monthly income.  Further, Wife contends that the court erred by placing a "cash cap on child support."  Finally, Wife argues that the court should have deviated upward from the guideline amount of child support.  In response, Husband maintains that the court not only was correct in placing a cash cap on child support, but that the trial court should have limited the amount of child support to $3200 per month.

Generally, the most important finding in a child support proceeding is the obligor's income.  *Anderton v. Anderton*, 988 S.W.2d 675, 680 (Tenn. Ct. App. 1998).  After the court determines the obligor's income, the guidelines require the court to calculate the amount of child support using the percentages contained in the guidelines.  *Id.*; Tenn. Comp. R. & Regs. r. 1240-2-4-.01(2) & (3), -.02(7), -.03(5).  The amount of child support provided by this calculation is presumptively correct.  *Anderton*, 988 S.W.2d at 681.  Courts may deviate from the guideline amount in certain situations.  Tenn. Comp. R. & Regs. r. 1240-2-4-.04.  If the court does not award the guideline amount, the court must

> make a written or specific finding that the application of the child support guidelines would be unjust or inappropriate in that particular case.  Findings that rebut these guidelines must state the amount that would have been required under the guidelines and include a justification for deviation from the guidelines which takes into consideration the best interest of the child.

Tenn. Comp. R. & Regs. r. 1240-2-4-.02(7).  Of particular importance to this case, the court

> may consider a downward deviation from the guidelines if the obligor demonstrates that the percentage applied to the excess of the net income above $10,000 a month exceeds a reasonable amount of child support based upon the best interest of the child

---

[10]The trial court originally set the child support award and determined alimony in a February 28, 2000 order. The court amended this order, which resulted in an increase in Husband's child support obligation.  The amended order also granted Wife alimony, which the court denied in the February order.  Husband argues that the court erred in amending its earlier order.  We disagree, however, because the February order was not a final judgment, as it failed to grant the parties a divorce.  It follows that the court could properly amend the order, because the order was subject to "revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of the parties." Tenn. R. App. P. 3(a).

and the circumstances of the parties. The court may require that sums paid above the percentage applied to the net income above $10,000 be placed in an educational or other trust fund for the benefit of the child.

Tenn. Comp. R. & Regs. r. 1240-2-4-.04(3).

In this case, the trial court failed to calculate Husband's income. Further, the court deviated downward from the presumptive amount provided by the guidelines and did not state the amount that the guidelines would have required. This is in contravention of the child support guidelines. Additionally, the court did not provide an adequate justification for the downward deviation of the child support award. The fact that the children have large trust accounts, which were in existence while the parties were married, is not a specific finding to support the conclusion that Husband demonstrated that the presumptive amount exceeded a "reasonable amount of child support based upon the best interest of the child and the circumstances of the parties." Accordingly, we remand the case in order for the trial court to determine Husband's income and to make a written finding supporting any deviation from the amount of child support as calculated by the guidelines.

We can address some of the parties' concerns regarding the calculation of child support. First, Wife contends that Husband is voluntarily underemployed. Prior to the divorce, Husband worked at Ducks Unlimited where he earned approximately $86,000 per year.[11] Husband voluntarily resigned from Ducks Unlimited on June 30, 1998. During the same time that Husband worked for Ducks Unlimited, Husband worked for his mother. While Husband was with Ducks Unlimited, he earned $7,000 per month for the management of his mother's financial affairs. Beginning on June 1, 1998, Husband earned $9,000 per month from his mother.

Whether an obligor is willfully and voluntarily underemployed is a question of fact, and the trial court has considerable discretion in its determination. *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001) (citing *Brooks v. Brooks*, 992 S.W.2d 403, 409 (Tenn. 1999) (Birch, J. dissenting)). When a trial court must determine whether a parent is willfully and voluntarily underemployed, the reasons for an obligor parent's decision to accept lower paying employment are relevant. *Ralston v. Ralston*, No. 01A01-9804-CV-00222, 1999 Tenn. App. LEXIS 529, at * 8 (Tenn. Ct. App. Aug. 3, 1999) (*no perm. app. filed*). In making its determination, the trial court must consider the party's past and present employment and whether the party's choice to accept a lower paying job was reasonable and made in good faith. *Willis*, 62 S.W.3d at 738 (citing *Ralston*, 1999 Tenn. App. LEXIS 529, at *7).

In making any determination of willful and voluntary underemployment, it is important to determine whether the leaving of previous employment was voluntary or involuntary. *Ralston*, 1999 Tenn. App. LEXIS 529, at * 10-11. When a party with child support obligations voluntarily leaves their employment and chooses to accept a job which provides significantly less income, courts are more inclined to find willful and voluntary underemployment. *Willis*, 62 S.W.3d at 738 (citing

---

[11]Wife insists that Husband earned $106,000 per year. The record does not support her assertion.

***Brooks***, 992 S.W.2d at 407). In addition, courts may consider a party's course of action and decision-making after leaving their previous employment. ***Ralston***, 1999 Tenn. App. LEXIS, at *11-16. Accordingly, it is important for courts to examine a party's efforts to replace lost income after the termination of their previous employment. ***Id.*** at *15.

In this case, the trial court concluded that after Husband left Ducks Unlimited, he received a "substantial increase in the salary he receives from his mother [and] . . . also added the duties of helping to manage his brother's financial affairs as well as the family trusts." Our review of the record substantiates this finding. At trial, Wife acknowledged that the couple had to move to Memphis in order for Husband to remain employed with Ducks Unlimited. Wife stated that the couple always knew that they would move back to Lake Forest, Illinois. Husband stated that he planned to move back to Illinois in order to manage his mother's affairs, take care of his brother's needs, and to become more involved with "the [Buchanan] Foundation through the family office in Illinois." Further, Husband stated that his employment in Illinois would be full time. Accordingly, the court examined Husband's reasons for terminating his employment with Ducks Unlimited and determined that it was a reasonable decision. The court also considered Husband's efforts to make up for any lost income. In light of the trial court's discretion in this question of fact, we cannot say that the evidence preponderates in favor of finding that Husband is voluntarily underemployed. Accordingly, we affirm the trial court's finding on this issue.

Both parties raise issues regarding the calculation of Husband's income. Wife contends that capital gains associated with the sale of the parties' Deerpath residence should be included when the court determines Husband's income for child support purposes. On his 1997 tax return, Husband reported a capital gain of $340,000 which represented the sale of the Deerpath residence. This capital gain should be included when the trial court calculates Husband's income for child support purposes.

"Generally, capital gains are included in the definition of gross income." ***Brooks v. Brooks***, 992 S.W.2d 403, 407 (Tenn. 1999) (citing Tenn. Comp. R. & Reg. ch. 1240-2-4-.03(3)(a)). In ***Smith v. Smith,*** No. 01-A-01-9705-CH-00216, 1997 Tenn. Ct. LEXIS 733, at *6-8 (Tenn. Ct. App. Oct. 29, 1997) (***no perm. app. filed***), we held that the trial court should have considered a one time capital gain when determining the obligor's income. In our decision, we distinguished ***Hall v. Hall***, No. 03A01-9701-GS-00030, 1997 Tenn. App. LEXIS 501 (Tenn Ct. App. July 21, 1997) (***no perm. app. filed***). In ***Hall***, we did not include an isolated capital gain when calculating Husband's gross income. ***Id.*** at *7. However, this was due to the fact that the capital gain was included in the marital estate. ***Id.***; ***see also Smith***, 1997 Tenn. App. LEXIS 733, at *8. In this case, the evidence fails to establish that the $340,000 capital gain was included in the marital estate. Accordingly, the trial court shall consider the $340,000 capital gain when determining Husband's income for child support purposes.

Wife also contends that the court should consider income from Husband's trusts when determining his income. As stated earlier, the Huntington Eldridge, Jr. Trust pays the property taxes

and mortgage on the Greenbay property.[12] Husband included this as income on his Rule 14 affidavit of monthly income. It follows that the court did consider this as income and will consider it as income on remand.

Husband states that the income provided on his Rule 14 affidavit includes income from his William Blair and Smith Barney Accounts. Husband contends that if we determine that these accounts are marital assets, then his income and corresponding child support obligations should be reduced accordingly. We agree with Husband. Section 36-4-121(b)(1)(E) of the Tennessee Code states as follows:

> Property shall be considered marital property as defined by this subsection for the sole purpose of dividing assets upon divorce or legal separation and for no other purpose; and assets distributed as marital property will not be considered as income for child support or alimony purposes, except to the extent the asset will create additional income after the division.

Tenn. Code Ann. § 36-4-121(b)(1)(E)(2001). Accordingly, if the trial court awards a portion of the accounts to Wife, the court cannot include income from Wife's portion of the accounts when calculating Husband's income for child support purposes.

Finally, Wife contends that the court erred by appointing Husband the trustee of the children's accounts. The court found that Wife had questionable spending habits that could lead to bankruptcy. Additionally, Wife testified that she did not know much about managing money. Our review of the record supports the trial court's decision to appoint Husband the trustee of the children's accounts.

We remand the case to the trial court to determine Husband's income pursuant to this opinion. The court shall then determine the amount of child support due under the guidelines. If the court finds that the guideline amount is unjust or inappropriate, the court must make a written finding to that extent which includes a justification for any deviation taking into consideration the children's best interests.

### *Alimony*

The court awarded rehabilitative alimony to Wife. In its award, the court ordered that Husband pay Wife $5,000 per month for five years, $3,000 per month for three years, and $1,500 per month for two years. Wife contends that the court erred in its award and should have ordered alimony *in futuro*. Based on our review of the record, the trial court's award of alimony is not contrary to the preponderance of the evidence. However, in light of our remand to the trial court to reconsider its distribution of the parties' marital property in accordance with this opinion, the court

---

[12]Wife states that the trust pays the mortgage, property taxes *and* home owner's insurance. This assertion is not supported by the record.

must reconsider its award of rehabilitative alimony as well. Section 36-5-101(d)(1)(G) & (H) of the Tennessee Code states that the trial court must consider the separate assets of each party in addition to the distribution of the parties' marital property when awarding alimony. Accordingly, we remand this case to the trial court for the reconsideration of alimony.

### Grounds for Divorce

Wife's next issue concerns the trial court's decision to grant the divorce to Husband on the grounds of inappropriate marital conduct. Wife maintains that the court's decision was motivated by its bias toward Husband and was not based upon an objective review of the record.[13] Wife contends that the court should have awarded her the divorce as she was the party less at fault.

Grounds for divorce are governed by statute in Tennessee. *Chastain v. Chastain*, 559 S.W.2d 933, 934 (Tenn. 1977). One cause of divorce of importance to this case is when "[t]he husband or wife is guilty of such cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper which may also be referred to in [the] pleadings as inappropriate marital conduct . . . ." Tenn. Code Ann. § 36-4-101(11) (2001). Essentially, inappropriate marital conduct is when "either or both of the parties [have] engaged in a course of conduct which (1) caused pain, anguish or distress to the other party and (2) rendered continued cohabitation 'improper,' 'unendurable,' 'intolerable,' or 'unacceptable.'" *Earls v. Earls*, 42 S.W.3d 877, 892 (Tenn. Ct. App. 2000) (Cottrell, J., concurring) (citations omitted).

The trial court's assessment of witness credibility is important when deciding whether a party should be awarded a divorce on the grounds of inappropriate marital conduct. *Newberry v. Newberry*, 493 S.W.2d 99, 101 (Tenn. Ct. App. 1973). In *Newberry*, we stated that "[t]he existence of such continuous refined cruelty can best be determined by the trier of facts who has seen the parties face to face and who has observed their manner and demeanor as well as that of their respective witnesses." *Id.*

In this case, the evidence does not preponderate against the trial court's decision to award Husband the divorce on the grounds of inappropriate marital conduct. The record contains proof that both parties contributed to the downfall of this marriage. The court found that Wife's conduct constituted a higher degree of fault than Husband's, however, citing Wife's abuse of alcohol, her use of illegal drugs, her conduct that was intentionally designed to hurt Husband, her conduct that was inappropriate in public, and her affair. Additionally, in the months preceding Husband's action for divorce, the record also establishes that Wife began to stay out late at night and refused to tell Husband her location. Much of this proof was corroborated by other witnesses at trial, including Wife. Accordingly, the record demonstrates that Wife's conduct caused pain, anguish and distress to Husband that rendered cohabitation unacceptable and unendurable. Further, the court specifically found that "much of the testimony of Wife was not credible, particularly as it relates to finances or

---

[13]In earlier portions of this opinion, we have addressed Wife's concerns regarding the trial court's alleged bias and have found the issue to be without merit.

the conduct of Husband." In light of our review of the record and the trial court's finding regarding Wife's credibility, the trial court did not err in granting the divorce to Husband on the grounds of inappropriate marital conduct.

### *Attorney's fees*

In Wife's next issue, she contends that the court erred in assessing Wife her attorney's fees and court costs. Wife relies in part on Rule 403 of the Tennessee Rules of Evidence. Pursuant to this rule, relevant evidence may be excluded if its probative value is substantially outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Wife argues that the trial court caused her to incur substantial attorney's fees and expenses by permitting Husband to "put on four weeks of cumulative evidence relating to Wife's fault."

In a divorce case, an award of attorney's fees is treated as an award of alimony *in solido*. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). Thus, when determining whether to award attorney's fees, the trial court is required to consider the same factors used when considering a request for alimony. *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). As with alimony, need is the critical factor to be considered by the court when deciding whether to award attorney's fees. *Herrera*, 944 S.W.2d at 390. An award of attorney's fees is proper when one spouse is disadvantaged and does not have sufficient resources with which to pay attorney's fees. *Id.* The question of whether to award attorney's fees, and the amount thereof, are largely left within the discretion of the trial court and will not be disturbed on appeal unless the trial court clearly abused that discretion. *Aaron v. Aaron,* 909 S.W.2d 408, 411 (Tenn. 1995).

In its decision, the trial court determined that "while the fault of the breakup of the marriage falls more heavily on Wife, each party contributed to the protracted nature of this litigation and both parties have sufficient liquid assets to pay their [own] attorney fees." Thereafter, the court refused to award attorney's fees to either party. From our review of the record, the trial court did not abuse its discretion by refusing to award Wife her attorney's fees. When Husband filed for the divorce, Wife's William Blair Account had a balance of over $700,000. Wife paid her attorney's fees from this account. Additionally, both parties will receive a significant amount of property as a result of this divorce that will enable them to pay their attorneys. Finally, the record wholly supports the trial court's conclusion that Wife contributed to the extensive litigation in this matter as well as Husband. Therefore, we conclude that the trial court properly denied Wife's requests for her attorney's fees.

### *Pendente Lite Support*

Wife's final issue regards the trial court's decision to terminate Husband's *pendente lite* support obligations prior to the court's final decree of divorce. The trial court has a great deal of discretion regarding the duration of temporary support. *See Brock v. Brock*, 941 S.W.2d 896, 903 (Tenn. Ct. App. 1996). In its order regarding the clarification of *pendente lite* support, the court

ruled that the support should end on February 28, 2000, the date the trial court entered its initial order regarding child support and alimony. The court did not abuse its discretion in terminating Husband's temporary support obligations as of that date.

### *Conclusion*

We affirm in part and reverse in part the decision of the trial court. The case is remanded to the trial court for proceedings consistent with this opinion. Costs of the appeal are taxed equally between the parties.

_____
DAVID R. FARMER, JUDGE