IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 3, 2004 Session

## JANNA SHEYA FALK v. GEARY FALK

**Direct Appeal from the Circuit Court for Summer County**
**No. 23859-C     C. L. Rogers, Judge**

---

**No. M2003-02134-COA-R3-CV - Filed January 21, 2005**

---

This is a divorce case involving an invalid marriage resulting from the existence of a subsisting previous marriage at the time of the parties' marriage ceremony in 1995. At the time of the parties' marriage ceremony, the purported wife's divorce from a previous marriage was still pending. The wife's divorce from her prior marriage did not become final until three and one-half months following the parties' marriage ceremony. The parties lived together as husband and wife until the wife filed for divorce in 2003. The trial court declared the parties divorced pursuant to section 36-4-101(2) of the Tennessee Code. The trial court then classified the parties' "marital" and separate property, making an equitable division of the "marital" property. The husband appeals the trial court's order granting a divorce and awarding certain property to the wife. For the reasons stated herein, we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and HOLLY M. KIRBY, J., joined.

Gary M. Williams, Hendersonville, Tennessee, for the appellant, Geary Falk.

David W. Garrett, Nashville, Tennessee, for the appellee, Janna Sheya Falk.

### OPINION

### *Factual Background and Procedural History*

On July 15, 1995, Plaintiff/Appellee Janna Sheya Falk ("Mrs. Falk") and Defendant/Appellant Geary Falk ("Mr. Falk" or collectively, with Mrs. Falk, "the parties") participated in a marriage ceremony in Hendersonville, Tennessee. At the time of the parties' purported marriage ceremony, Mrs. Falk was still legally married to Richard James Bond ("Mr.

Bond"), a resident of California. Mrs. Falk and Mr. Bond were married in California and lived together for three months before Mr. Bond filed a *pro se* petition for divorce (the "California divorce"). The California divorce did not become a final judgment until November 2, 1995, approximately three and one-half months after the Falks' Tennessee marriage ceremony.

Mrs. Falk testified that she and Mr. Falk discussed the fact that the California divorce was pending, but the parties agreed to proceed with the marriage despite the fact that the California divorce was not yet final. Mrs. Falk further testified that, throughout the duration of the marriage, the parties discussed and "joked" with themselves and others about the California divorce and its effect on their marriage. In his testimony, Mr. Falk vehemently denied ever discussing or "joking" about the California divorce and believed that the parties were legitimately married up until he was informed otherwise during a hearing held after the commencement of the parties' divorce action. What is undisputed is that, throughout the nearly eight years that the parties lived together, they neither consulted an attorney about the validity of their Tennessee marriage nor attempted to solemnize their marriage after the California divorce became final.[1]

On November 15, 1995, after the marriage ceremony, Mr. Falk purchased a home in Millersville, Tennessee (the "Millersville house"). The Millersville house was conveyed by warranty deed to Mr. Falk, as a "single man." The deed conveying the Millersville house to Mr. Falk makes no mention of Mrs. Falk. Neither party disputes the fact that the entire amount of the $35,621.40 down payment on the Millersville house came exclusively from Mr. Falk's separate funds.[2] With regard to the manner in which the mortgage on the Millersville house was paid, the parties testified that Mr. Falk would write a check from his business account, which Mrs. Falk would deposit into the parties' joint checking account. She would then make the mortgage payment from the parties' joint account. In or around 2002, the parties refinanced the Millersville house withdrawing $11,000.00, which was deposited into the parties' joint checking account. According to the parties' testimony, Mrs. Falk's name was "added" to the loan papers for this second mortgage.[3]

---

[1] On the front page of the California divorce judgment, dated and mailed to Mrs. Falk on November 2, 1995, was a warning statement set off in a box that read as follows: "WARNING: NEITHER PARTY MAY REMARRY UNTIL THE EFFECTIVE DATE OF TERMINATION OF MARITAL STATUS AS SHOWN IN THIS BOX."

[2] The down payment on the Millersville house came primarily from funds Mr. Falk received from a government loan when his California residence was damaged by an earthquake in 1994. During the early years of the alleged marriage, Mr. Falk continued to own both the Millersville house and the California house, which was damaged by the earthquake. During that time, Mr. Falk made payments through his business checking account of only the interest amount on the government loan, although the record reflects that Mrs. Falk also wrote at least two checks through the parties' joint checking account covering monthly interest payments. When the California residence sold, the government loan was repaid.

[3] We note that, although the parties indisputably agree that Mrs. Falk was in some capacity made a party to the refinancing, the record does not include any paperwork related to this refinancing transaction. In their briefs to this Court, the parties interchangeably state that Mrs. Falk's name was added to the refinancing papers, that her name was added to the deed, and that the Millersville house became "jointly titled." In reviewing the parties' testimony, it is unclear, with regard to the record title of the Millersville house, whether Mrs. Falk's name was a part of only the

(continued...)

-2-

During their relationship, Mr. Falk operated a home improvement and repair company ("Kriste Maintenance") out of the Millersville house, while Mrs. Falk worked primarily as an administrative assistant for the Tennessee Bureau of Investigation (the "TBI"). Mrs. Falk testified that she paid for the parties' household expenses out of her income from the TBI, including expenses for food, utility bills, her car payment, and Mr. Falk's daughter's student loan. In his testimony, Mr. Falk claimed that the expenses for the house payment, car payment, and his daughter's student loan were covered by income generated by Kriste Maintenance, income he earned as County Commissioner, and cash gifts of $400.00 from Mr. Falk's son to Mrs. Falk. Mrs. Falk testified that, from at least 1997 through 2002, the parties filed their income tax returns jointly.

On February 18, 2003, Mrs. Falk initiated this divorce action. After a series of opposing pleadings and intervening motions, Mrs. Falk filed an amended complaint on June 18, 2003, wherein she asserted that she and Mr. Falk were married prior to the finalization of the California divorce and that Mr. Falk knew of this fact. Additionally, she asserted that the parties did not obtain a marriage license until two days after the marriage ceremony. In her amended complaint, she requested that the trial court enter an order declaring either a divorce or annulment. She further requested that the court make an equitable division of all jointly-held assets and liabilities, including the equity in the Millersville house. In addition, she requested, among other things, that certain items be awarded to her as her separate property, including two dogs and a 1999 Subaru vehicle. In his answer to Mrs. Falk's amended complaint, Mr. Falk denied having knowledge of the subsisting nature of Mrs. Falk's previous marriage and asserted that the parties' resulting marriage was void. Therefore, Mr. Falk sought a decree declaring either the parties divorced or that they were never married. Mr. Falk also requested, among other things, that the court award him the entire value of the Millersville house and divide the parties' remaining assets and debts.

In its Final Decree of Divorce, the trial court declared the parties divorced pursuant to section 36-4-101(2).[4] The trial court awarded Mrs. Falk as her separate property sundry items of furniture, electronic equipment, and compact discs; her personal checking and retirement accounts; the Subaru vehicle; and two dogs. Mr. Falk was awarded as his separate property the value of Kriste Maintenance prior to the parties' marriage; certain items of work equipment and tools; his checking and business account; and the remaining pets. The trial court awarded the Millersville house to Mr. Falk, but Mrs. Falk was granted a lien in the amount of $28,800.00 against the residence as her "marital" equity interest. Additionally, the trial court ordered Mr. Falk to pay Mrs. Falk $7,500.00 as a further division of the "marital" estate. The court further ordered each party to be responsible for his/her respective credit card debts, and Mr. Falk was assigned responsibility for his daughter's student loan. The court found that any federal income taxes owed for 2002 were a joint debt, with each party being responsible for one-half of the debt or entitled to one-half of any refund. The trial

---

[3](...continued)
refinancing transaction in 2002 or was "added" to "the deed" at the time of the 2002 refinancing. The only deed in the record is the original warranty deed conveying the Millersville house to Mr. Falk alone.

[4]Section 36-4-101(2) provides as a ground for divorce where "[e]ither party has knowingly entered into a second marriage, in violation of a previous marriage, still subsisting." Tenn. Code Ann. § 36-4-101(2) (2001).

court ordered each party to pay his/her own attorney's fees, and other litigation expenses were divided equally between the parties.

Mr. Falk appeals from the judgment of the trial court presenting, as we perceive them, the following issues for our review:

> (1) Whether the trial court erred in declaring the parties divorced pursuant to section 36-4-101(2) of the Tennessee Code;

> (2) Whether the trial court erred in awarding Mrs. Falk $28,000.00 as her equity in the Millersville house;

> (3) Whether the trial court erred in its valuation and consideration of certain property and thereby erred in awarding Mrs. Falk an additional $7,500.00 in the division of the marital estate; and

> (4) Whether the trial court erred in its division of disputed personal property.

Mrs. Falk raises the following additional issue:

> Whether Mrs. Falk should be awarded her attorney's fees on appeal.

For the reasons contained herein, we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

### Standard of Review

In matters heard by a trial judge sitting without a jury, our review of the trial court's findings of fact is *de novo* upon the record, accompanied by a presumption of correctness. Tenn. R. App. P. 13(d) (2004). We will not reverse the trial court's factual findings unless the evidence in the record preponderates against those findings. *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996). A trial court's conclusions on questions of law are reviewed *de novo*, but without any presumption of correctness. *Id*. (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)).

### Validity of the Marriage

Before we address the propriety of the trial court's order granting a divorce to the parties, we will first address the validity of the underlying marriage in the case at bar. It is undisputed that, at the time the parties participated in their marriage ceremony, Mrs. Falk was still legally married to Mr. Bond and remained married to Mr. Bond for three and one-half additional months. Therefore, although Mrs. Falk's divorce from Mr. Bond eventually finalized, her marriage to Mr. Falk on July 15, 1995 was, by law, bigamous. Section 36-3-102 of the Tennessee Code expressly states that "[a] second marriage cannot be contracted before the dissolution of the first." Tenn. Code Ann. § 36-3-

102 (2001). In line with the long-standing public policy of this state, a bigamous marriage is a void marriage. *Old Republic Ins. Co. v. Christian*, 389 F. Supp. 335, 337 (E.D. Tenn. 1975); *Sellars v. Davis*, 12 Tenn. (4 Yer.) 503 (1833); *Taliaferro v. Rogers*, 248 S.W.2d 835, 837 (Tenn. Ct. App. 1951). Void marriages are void *ab initio* and are neither given recognition by the courts nor are such marriages capable of ratification by the parties. *Coulter v. Hendricks*, 918 S.W.2d 424, 426–27 (Tenn. Ct. App. 1995); *Taliaferro*, 248 S.W.2d at 837. Until Mrs. Falk's marriage to Mr. Bond was formally dissolved, she lacked the legal capacity to marry. *Taliaferro*, 248 S.W.2d at 837. After the California divorce became final, Mrs. Falk was free to enter into a valid marriage. However, she made no further attempt to validly solemnize this marriage. Furthermore, Mrs. Falk cannot rely on principles of common law marriage based on the parties' continued habitation, as it is well settled that common law marriages cannot be established in Tennessee. *Crawford v. Crawford*, 277 S.W.2d 389, 391 (Tenn. 1955); *Smith v. N. Memphis Savings Bank*, 89 S.W. 392, 392–93 (Tenn. 1905). Thus, we conclude that the parties' purported marriage was void from its inception and, as such, constituted a legal nullity.

Having decided that the parties' marriage was invalid, we turn to the issue of whether the trial court erred in declaring the parties divorced pursuant to section 36-4-101(2) of the Tennessee Code. Section 36-4-101(2) provides that the court may grant a divorce where "[e]ither party has knowingly entered into a second marriage, in violation of a previous marriage, still subsisting." Tenn. Code Ann. § 36-4-101(2) (2001). In other words, bigamy is one of the many grounds for divorce in Tennessee. *Id*. Mr. Falk argues that the trial court should have granted an annulment in this case because the marriage between him and Mrs. Falk was void, and he argues there should not be a divorce decree acknowledging such a marriage. However, although he sought either a divorce or decree "declar[ing] that the parties are not married," it does not appear in the record that Mr. Falk ever specifically requested an annulment in this case. While it is true that a court may annul a void, bigamous marriage, *Estes v. Estes*, 250 S.W.2d 32, 34 (Tenn. 1952); *Brown v. Brown*, 29 S.W.3d 491, 494–95 (Tenn. Ct. App. 2000), it is equally clear that a court may grant a divorce on the ground of a prior, subsisting marriage. Tenn. Code Ann. § 36-4-101(2); *Hill v. Hill*, 326 S.W.2d 851, 854 (Tenn. Ct. App. 1958). In the case of void marriages, decrees of divorce or annulment, both serve the identical practical function of providing a public record declaring that the purported marriage was invalid. *Pewitt v. Pewitt*, 240 S.W.2d 521, 526 (Tenn. 1951). Under the circumstances of this case, we cannot say that the trial court abused its discretion in declaring the parties divorced pursuant to section 36-4-101(2) of the Tennessee Code. *See Pewitt*, 240 S.W.2d at 526 (applying abuse of discretion standard to trial court's order granting a divorce under predecessor statute to section 36-4-101(2)).

### *Trial Court's Award of Equity Interest in Millersville House as "Marital Property"*

The primary asset in dispute is the equity in the Millersville house. As stated above, the trial court awarded Mrs. Falk, as part of her division of the "marital" property, a one-half interest in the equity in the Millersville house. Mr. Falk asserts that this award was error for the following reasons: the marriage was void; the house was purchased and titled solely in his name up until the refinancing in 2002; Mrs. Falk's name was "added" solely as a requirement by the lender that the "spouse" be

made a party to the loan; and he would never have refinanced the house had he known that the marriage was invalid.[5] Therefore, Mr. Falk contends that he should be granted the entire value of the house as his separate property or should at least be given credit for the down payment and the value of repairs and improvements that he made to the house, which he valued at $30,000.00.

In issuing its ruling from the bench, the trial court made the following oral findings:

The Court finds that these people have been married eight years, married in every conceivable way. Each gave a hundred percent of what they had in their abilities. I didn't find any contrary evidence of that. They each gave all they could toward the accumulation of the marital assets. They've intermingled all their funds, put them in a pot, and just, as I say, they were married in every way.
I'm troubled by the fact that there's seven years worth of tax returns that were filed jointly in the marriage, there's mortgages, there's other loans that were obtained on the representation that they were married. All those go into my decision in what -- exercising my discretion as to whether an annulment or divorce should be granted.

Looking at that, I believe that it is most reasonable and most appropriate, under these facts, to simply declare that these parties are divorced pursuant to T.C.A. 36-4-101(2), preexisting marriage. They are divorced from the bonds of matrimony.

This, therefore, leads me to the requirement that we make an equitable division of the property, determining separate property and marital property, and making an equitable division. . . .

The court then found that the Millersville house had a fair market value of $214,000.00 and awarded Mrs. Falk one-half of the equity as part of her division of the "marital" estate.

It is well recognized that in a traditional divorce setting, trial courts have broad discretion in fashioning an equitable division of the marital estate, and appellate courts give great weight to a trial court's division of marital property. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996). Such decisions regarding the division of the marital estate will be presumed correct unless the evidence preponderates otherwise or unless they are based on an error of law. *Id.* Tennessee, as a "dual property" state, distinguishes between "marital" and "separate" property in the context of a divorce proceeding. *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002) (citing *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988)). Only "marital property" is subject to equitable division by the courts. *Id.* at 12–13. Therefore, the trial court must make a threshold determination of whether certain property is "marital" or "separate." *Id.* at 13. However, because "marital property" is a legal fiction created by statute, *see* Tenn. Code Ann. § 36-4-121(b) (2001),

---

[5]Again, we note that there is nothing in the record, besides the parties' ambiguous testimony, verifying the fact that there was a new deed drafted at the time of the 2002 refinancing that conveyed Mrs. Falk an interest in the Millersville house.

"the concept has no real meaning outside of the realm of marital dissolution." *In re Hohenberg*, 174 B.R. 487, 493 (Bankr. W.D. Tenn. 1994). Thus, "marital property" is only considered in the context of an equitable division of property resulting from the dissolution of a valid marriage. *Arms v. Stanton*, 43 S.W.3d 510, 513 (Tenn. Ct. App. 2000); *see also* Janet L. Richards, Richards on Tennessee Family Law § 3-6 (2d ed. 2004). Therefore, we conclude that a valid marriage is a foundational threshold to any analysis regarding the equitable division of marital property.

It appears from our research that there is but one case from this state that directly addresses the consequences of property being transferred or acquired during a bigamous marriage and the interest in that property of the parties to the marriage. *Arms v. Stanton*, 43 S.W.3d 510 (Tenn. Ct. App. 2000). In *Arms*, this Court was faced with a somewhat similar situation as the one presently before this Court. *Id.* In that case, Mr. Arms entered into a bigamous marriage with Tammy Lou Arms while he was still married to one Ms. McCord. *Id.* at 511. During his "marriage" to Tammy Lou, Mr. Arms purchased real property in Tennessee and subsequently conveyed by quitclaim deed all of his interest in the real property to Tammy Lou. *Id.* Several years later, Tammy Lou filed for divorce, and, during the pendency of the divorce, conveyed the property to one Mr. Stanton for $50,000.00. *Id.* After Mr. Arms learned of the transaction, he brought a third-party action against Mr. Stanton, claiming a marital interest in the real property and seeking fifty percent (50%) of the fair market value of the real property. *Id.* On appeal, this Court held that Mr. Arms could not claim a "marital interest" in the property because the parties were not legally married and, without a valid marriage, the real property could not be considered "marital" property. *Id.* at 513.

In a similar way, Tennessee courts have held that a valid marriage is a prerequisite to an award of alimony. In *Pewitt v. Pewitt*, 240 S.W.2d 521, 526 (Tenn. 1951), the Tennessee Supreme Court held that an alimony obligation cannot be based on an a void marriage because any right to alimony is premised first on the duty of support that arises from the marital relation. *Id.*; *see also Scurlock v. Scurlock*, 22 S.W. 858, 859 (Tenn. 1893) (finding that without a valid marriage, there can be no duty of support); *Sellars v. Davis*, 12 Tenn. (4 Yer.) 503 (1833) (holding that a second marriage contracted during the existence of a previous marriage was void to all intents and purposes).

Therefore, in light of the foregoing authorities, we conclude that where the marriage is void from its inception, as in this case, Mrs. Falk may not rely on the doctrine of marital property to claim an interest in property titled in Mr. Falk's name. *Arms*, 43 S.W.3d at 513. Thus, we conclude that it was error for the trial court to have made an equitable division of the parties' "marital" property. Furthermore, as the only evidence in the record of title to the Millersville house is the deed to Mr. Falk, the evidence preponderates against any implicit finding of joint title. We therefore reverse the trial court's judgment in this respect. This issue is remanded to the trial court for a determination of whether Mrs. Falk was in fact conveyed an interest in the Millersville house by deed or whether she was simply required to join in the execution of a deed of trust related to the refinancing in 2002. Should the parties present evidence that Mrs. Falk was indeed conveyed a joint interest in the property, then it is likely that the Millersville house would be held as tenants in common. *See Knight v. Knight*, 458 S.W.2d 803, 806–07 (Tenn. Ct. App. 1970) (holding that a valid, existing marriage

is essential to the creation of a tenancy by the entirety but a deed purporting to convey an estate by the entireties can still be effective to create a tenancy in common). If the evidence demonstrates that she was in actuality only made a party to the deed of trust, then it follows that she is not entitled to a "marital" interest in the Millersville house and the property should be awarded to Mr. Falk as his separate property.

### *Award of $7,500.00 to Wife as Further Division of Marital Estate*

After the court divided the "marital" property, it awarded Mrs. Falk $7,500.00 in order to equalize the parties' share of the "marital" estate. In view of the conclusion that there can be no "marital" property interest created during a void marriage, we consequently conclude that the trial court erred in this respect. Therefore, we reverse the trial court's award of $7,500.00 to Mrs. Falk as a further division of the "marital" estate.

### *Division of Disputed Personal Property*

Mr. Falk argues that the trial court erred in dividing several items of personal property, including the Subaru vehicle; assorted pieces of furniture, electronic equipment, musical recordings; and two dogs. In its ruling regarding the division of these assets, the trial court stated as follows:

The wife will then receive her Subaru auto. . . .

The animals. . . . We have, I believe, a total of five dogs and one cat. . . . So I think it's simply fair that if the wife wants Rio and Sadie, she should keep those, and the husband should keep the other three and the cat.

As far as other items of particular personal property, the Court finds it equitable that the - - as said, that the wife receive the dresser as her separate property. Also, the wife will be entitled to half the CD's. . . .

The roaster was considered, I believe, a gift to the wife. The Mitsubishi TV sounds equitable since there's a big screen and other TVs left at the house. That goes to the wife. One set of office furniture, since there's two, sounds equitable. Since the husband has purchased a new computer, the wife should receive the I-MAC computer. . . .

Reading the court's findings in context with its entire ruling, it appears that the court applied marital property equitable distribution principles when fashioning its division of these assets. As set forth above, we believe it was error to approach the division of these assets in terms of "marital" property. Because the parties were not validly married, the rules of equitable distribution in the context of section 36-4-121 do not apply. Instead, the parties should be restored, insofar as it is possible, to the positions they held prior to the invalid marriage. Property titled in each party's individual name should be granted to the titled party. However, with regard to jointly owned

property, should the trial court find joint title to certain property or be unable to determine how the property is titled, the court should make an equitable division of the parties' respective rights in such property, without resort to the factors applicable to "marital property." Therefore, we remand this matter to the trial court to determine the respective title and ownership rights to certain property.

We understand that, on remand, the trial court's findings with regard to these separate items of personal property may be generally in line with its previous order. Thus, with respect to certain items that the trial court determined were either gifts or the separate property of Mrs. Falk, namely the dresser, the cabinet and stool, and the roaster, we conclude that the record supports the trial court's decision. We further conclude that the trial court's division of the compact discs was an appropriate division of the parties' separate property. Additionally, although the trial court divided the parties' pets as a part of what appeared to be a "marital property" equitable division analysis, we conclude that the record supports the court's division as there was controverted evidence regarding the parties' respective claims to the two dogs. With regard to the IMAC computer and the office furniture, these items were purchased during the relationship, but it is unclear whether Mr. Falk purchased these items from his individual account or with funds from the parties' joint bank account. However, the record reflects that the Subaru vehicle was titled in Mr. Falk's name and that the Mitsubishi television was purchased by Mr. Falk before the parties' purported marriage. Accordingly, these items should be awarded to Mr. Falk as his separate property. Therefore, it becomes necessary for us to remand to the trial court for a reconsideration of the corresponding ownership rights in the IMAC computer and the office furniture.

### *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to Plaintiff/Appellee, Janna Sheya Falk, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE