IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 23, 2012 Session

## JEFFERY CHARLES HAYES
v.
## MELISSA MARIE HAYES

**Appeal from the Circuit Court of Shelby County**
**No. CT-001997-08   Donna M. Fields, Judge**

**No. W2010-02015-COA-R3-CV - Filed October 18, 2012**

This is a divorce appeal, primarily over property issues. The parties were married for approximately six years, with no children born of the marriage. During the marriage, they owned several homes, including the home in which they lived, but some went into foreclosure. Given the complicated state of the parties' finances, the trial was lengthy. At the conclusion of the trial, the trial court entered an order holding that the home in which the couple lived was the wife's separate property and dividing the remainder of the parties' assets and debts. The husband now appeals, raising numerous issues. We affirm in part, and reverse the finding that the home in which the parties resided was the wife's separate property. In light of our holding that the home in which the parties lived was marital property, we remand the matter to the trial court for reconsideration of its division of the marital estate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Mitchell D. Moskovitz and Mary Morgan Whitfield, Memphis, Tennessee for the Defendant/Appellant Jeffery Charles Hayes

Beth Brooks, Memphis, Tennessee for the Plaintiff/Appellee Melissa Marie Hayes

## OPINION

### FACTS AND PROCEEDINGS BELOW

Defendant/Appellant Jeffery Charles Hayes ("Husband") and Plaintiff/Appellee Melissa Marie Hayes ("Wife") married in January 2002, at ages 46 and 38, respectively. This was the second marriage for both. No children were born of this marriage, but each party had children from their prior marriages. When the parties married, Wife was working as a real estate agent and Husband was a superintendent for his brother's construction company.

Prior to the marriage, Wife owned a house located on High Plains Drive in Bartlett, Tennessee ("High Plains home"), titled in her name only. During the first few years of marriage, the parties had a joint checking account, and the mortgage on the High Plains home was paid out of this joint account. After a few years, Wife became dissatisfied with this arrangement and decided that she wanted the parties to instead have separate accounts. Wife then paid the mortgage from her earnings deposited into her separate account.

In 2005, in order to purchase a luxury vehicle, Wife took out a home equity line of credit ("HELOC") on the High Plains home. In 2006, the parties agreed that Husband could also take funds from the HELOC, to be used in part for his business. In connection with this, the bank required Wife to add Husband to the title of the home. As a result, Wife executed a quit claim deed transferring title to the High Plains home to both parties, jointly. The HELOC remained in Wife's name only.

After two years of marriage, Husband left his job with his brother's construction company and, with Wife's blessing, began building houses. Husband built a number of houses in a subdivision known as Ole Bartlett Village, and Wife was the listing agent for them. All but one of these houses were sold, and the parties rented the single unsold home ("Ole Bartlett Village Home"). Husband built more houses in a subdivision called Arlington Downs; again, Wife was the listing agent. Throughout this time, Wife was doing well as a real estate agent, but Husband began experiencing financial difficulties.

Wife told her father, Gary Blume ("Blume")[1] about Husband's financial problems. In response, Blume wrote Husband a $20,000 check to be used in Husband's business. Sometime later, Blume assisted Husband further by pledging a certificate of deposit ("CD") valued at approximately $14,000 as collateral for property Husband sought to purchase.

---

[1]Several different spellings for Wife's father's last name appear in the record. In this opinion, we will refer to Wife's father's last name as "Blume."

Shortly after the parties were married, Wife's parents gave her a rental property located on Anderson Bend ("Anderson Bend property"). The parties also acquired five rental properties during the marriage located on Hammond Street and Henrietta Road (collectively "Hammond and Henrietta Properties"). Husband renovated some of these properties and managed all of them, with the assistance of a property management firm. Husband's responsibilities included maintenance, yard upkeep, paying the bills, and working with the property manager to ensure that the properties stayed rented.

After six years of marriage, on April 23, 2008, Wife filed a complaint for divorce in the Circuit Court of Shelby County, Tennessee, citing irreconcilable differences and inappropriate marital conduct. At that time, it appears that the mortgage payments, insurance and taxes on several of the parties' rental properties were overdue. Wife took over management of the parties' rental properties and obtained an *ex parte* restraining order against Husband prohibiting him from interfering with Wife's collection of rents from the tenants. Two days later, Husband filed an answer and counter complaint for divorce, alleging irreconcilable differences and inappropriate marital conduct by Wife.

While the divorce proceedings were pending, Wife spent significant sums from one of her retirement accounts in a fruitless attempt to keep the Hammond and Henrietta properties from going into foreclosure. Eventually, Wife decided to stop making payments on the properties and they were foreclosed upon prior to trial.

The trial court conducted the trial in this matter over five days in May 2009. It heard testimony from several witnesses, including the parties, Wife's father Gary Blume, and the property manager for the rental properties. Much of the evidence centered on financial disputes.

Wife testified at the outset. In the beginning of the marriage, Wife said, the parties had a joint bank account, into which Wife deposited the majority of the funds she received in the settlement from her prior divorce. When asked why, Wife replied: "Because I was raised that when you are married, everything is together." This account remained joint for approximately four years. The mortgage on the High Plains home was paid from this joint account.

Eventually, Wife stated, she became exasperated with the way Husband managed money and felt that he was not contributing sufficiently. She especially believed that he did not contribute to the High Plains home in which the couple lived. When the parties first married, they decided that Wife would deposit her child support payments into their joint account to cover the mortgage for the High Plains home. When Wife's child support ended in 2005, Wife apparently expected Husband to begin making a greater financial contribution, and he

did not do so. At most, she claimed, he occasionally paid the utilities or bought some groceries, and when she asked him to contribute more, he told her that he had no money. Consequently, in 2005, Wife separated the parties' bank accounts, and from then on she paid the mortgage payment on the High Plains home out of her earnings.

Wife also testified about the HELOC on the High Plains residence. She said that she initially took out the HELOC in 2005 in order to use $50,000 from the equity in the High Plains home to buy a BMW convertible. In 2006, Husband asked to borrow an additional $50,000 through the HELOC. Wife was reluctant, but relented. At this point, Wife explained, the bank "made me sign this quit claim deed over so the lien could get the money [sic]." In this way, the High Plains home came to be titled in both parties' names jointly.

Wife testified that she took over the parties' rental properties in May 2008 after she filed for divorce. She explained that she obtained an order enjoining Husband from collecting the rents on the properties because Husband was not paying the bills. Wife acknowledged that her attempt to manage the Hammond and Henrietta properties was "disastrous." In an effort to catch up on the past due mortgages and taxes, she put $41,000 from her retirement funds into the properties. Her effort failed. After consulting with her father and her attorney, Wife finally made an executive decision "just to let them go back to the bank, after I got the appraisals on all the properties for this divorce and seeing the lack of value in all of them." Wife asserted: "If anyone is reading the news, you can see what the real-estate market is doing right now. I couldn't survive. Something had to go. I couldn't keep paying everything." Thus, the Hammond and Henrietta rental properties went into foreclosure. Wife also described paying other expenses associated with the Ole Bartlett Village rental property and the Anderson Bend rental property.

In his testimony, Husband acknowledged the parties' disputes over finances. However, he emphasized that he believed that the cause of their problems was Wife's inappropriate relationship with a business associate.

With respect to the High Plains home, Husband testified that he contributed both financially and by making improvements to the home. Financially, he said, he contributed approximately $600 per month to the parties' joint account from which the mortgage was paid, and he sometimes paid the utility bill. Husband said that he also paid the interest payments on the HELOC on the High Plains residence from January 2007 until he moved out of the home in February 2008. Husband described the improvements he made to the home:

> [Wife] wanted the carpet removed in the den, so I pulled it up and repoured the concrete and stained it and scored it, took about a week to do that. I repainted one of the upstairs bedrooms. I bought the paint on that. I replaced a pool

pump. I maintained the sprinkler system from the time I lived there until the time I moved out. I cut the grass up to 2006, the fall of 2006, maintained the yard. I replaced all the kitchen faucets in the master bathroom myself [sic], replaced two lighting fixtures in the master bedroom myself, replaced the kitchen sink faucet myself, paid for the repair of the icemaker. I can remember some more as – repaired the sheetrock inside the house prior to all the house being repainted.

Husband agreed with Wife that the High Plains home came to be titled in their joint names because the bank required it in connection with the HELOC. Husband testified that the approximately $50,000 he withdrew from the HELOC was used in his construction business and to cover shortfalls associated with the parties' rental properties. Husband described the parties' rental properties as a "financial drain." He said that, at times, he borrowed against credit cards to keep up the properties and his construction business. He said that he experienced monthly shortfalls on the Hammond and Henrietta properties, but when Wife filed for divorce and obtained the *ex parte* injunction against him, the payments on those properties were less than 30 days behind.

With respect to $20,000 from Wife's father Blume, Husband testified: "I thought it was a gift . . . he came up and gave me a check and said use this in the business." Husband emphasized that no note was signed, and observed that Blume did not ask for repayment until Wife filed for divorce. Husband claimed that, after the closing on a house that he built, he gave $10,000 back to Blume, but Husband said it was a "gift", rather than repayment of debt.

Wife's father, Gary Blume, also testified at trial. Blume said that he is a real estate developer. Blume stated that he learned from Wife about Husband's financial need, and took it upon himself to help Husband by giving him the $20,000 as a loan, to be used in Husband's business, on the Ole Bartlett Village property. When he gave Husband the money in February 2005, Blume said he told Husband that he "would just as soon" Husband pay him interest as the bank; consequently, Blume claimed that Husband knew that the money was a loan. Blume said Husband had never repaid him any of the money or paid him any interest, and specifically denied that Husband gave him $10,000. In addition, Blume pledged a CD valued at approximately $14,000 as collateral for Husband to purchase one of the houses on Hammond. The bank had since foreclosed on that property and was asserting a claim to Blume's CD.

Finally, the trial court heard testimony from Tracy Lowe ("Lowe"), an employee of Dogwood Realty, the property management firm retained by the parties to manage the Hammond and Henrietta properties. Lowe said that she advised Husband and Wife that the Hammond properties were not a good investment, for various reasons, but her advice was not heeded.

Lowe said she dealt primarily with Husband. She described Husband as "involved" and complimented his renovations to the properties. After a time, Wife began managing the properties; Lowe said that Wife was less involved than Husband had been. Lowe described certain repairs Wife had made to the properties, such as replacing a stolen air conditioner and replacing floors. Asked whether Lowe herself would have continued to sink money into the properties or just let the properties go into foreclosure, Lowe replied that she would have "given up."

After hearing the witnesses testify and reviewing the 117 exhibits that were entered into evidence, the trial court issued an oral ruling in January 2010. The trial court found that Husband was primarily at fault for the breakup of the marriage. It then outlined its division of the marital estate. At the outset, the trial court classified the High Plains home in which the parties lived as Wife's separate property:

> At the time of the marriage, [Wife] owned the residence [on] High Plains Drive, Bartlett, Tennessee, which was awarded to her as a settlement from a prior divorce. During the course of the marriage and for the purpose of refinancing the home so that [Husband] could borrow $50,000 dollars[] worth of equity in the High Plains Drive residence, Melissa Hayes added the name of Jeffery Charles Hayes to the marital residence.
>
> It was the testimony of [Wife], and has been her position throughout, that she was either not aware that [Husband's] name was added or that it was added inadvertently and it was never any intention on her part to transfer any portion of that residence to [Husband].
>
> [Husband] testified that he averaged 400 to 600 per month toward joint obligations. However, when pressed he stated that a portion of those funds were when he and his wife would go out to dinner, he would buy groceries and bring those to the residence.
>
> [Wife] testified that he would pay an odd utility bill sometimes, but that primarily she paid for the mortgage, utility bill, telephone, insurance, and all of the other basic expenses of the residence, including yard maintenance, house maintenance, pool cleaning fees and all other expenses.
>
> The Court is required to allocate assets as marital and separate and the facts in evidence shows [sic] this Court that the sole purpose of the quit claim deed was to facilitate a loan to [Husband], which was not used for joint obligations or for the marriage therefore pursuant to the case of **Smith v. Smith**, 2000

Westlaw 1605565, a June 9, 2009 Court of Appeals decision,[2] the Court finds that equity requires that the High Plains property remain separate property . . . .

This part of the trial court's oral ruling was incorporated into the written order issued on July 30, 2010. The written order added that Husband "contributed little, if any, toward expenses of this residence and owes $50,000.00 plus interest toward the second mortgage on that property . . . ." The trial court allocated to Wife the first mortgages and what remained due on the High Plains home.

The written order made other factual findings and allocated the marital assets and debts. The trial court referred to the money Wife's father Blume gave to Husband as a loan, apparently crediting Blume's testimony over Husband's assertion that the money was a gift. Husband had argued at trial that the money Wife spent on the rental properties and her decision to allow them to go into foreclosure amounted to dissipation of marital assets and failure to preserve marital assets. The trial court expressly credited Wife's testimony on this issue; it found that Wife had made reasoned business decisions about the properties and there was no dissipation by Wife.

The trial court's written order made a partial resolution of the issues on the parties' Anderson Bend property. It held that the appreciation in value of the Anderson Bend property was marital property. However, instead of making findings as to the value of the property on the date the parties married and on the date of the divorce, the trial court instructed the parties to "use the county assessor[']s values on the date of the marriage and the date of the divorce decree to determine what the equity was in the property when transferred to [Wife] by her parents and the value at the time of trial."

Some issues remained unresolved by the trial court's written order. Consequently, some six months later, in February 2011, the trial court entered a final divorce decree intended to address the lingering issues that remained. In addition to reiterating some of its earlier holdings, the February 2011 order held that Wife did not fail to preserve the parties' rental properties and was not responsible for the financial losses incurred on the properties. It directed the parties to sell the Ole Bartlett Village property and apply the proceeds from the sale toward the mortgage on the property, toward repayment of the $20,000 loan from Wife's father Blume, and toward replacement or release of the $14,000 CD pledged by Blume for

---

[2] We note that the correct citation for *Smith v. Smith* is 2009 WL 1605565. In addition, *Smith v. Smith* was designated as a memorandum opinion pursuant to Rule 10 of the Rules of the Court of Appeals, and thus is not to be cited as authority "for any reason in any unrelated case."

the benefit of the parties.[3]   With respect to the Anderson Bend property, the trial court slightly modified its previous directive, instructing the parties to "use the Shelby County Tax Assessor's value on the date of the marriage and the date of July 30, 2010, Findings of Fact and Conclusion of Law to determine the equity in this property."

In July 2011, the trial court modified the final divorce decree, to change slightly its allocation of court costs.  Husband now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

Husband raises eight issues on appeal:

> 1.  Did the trial court err in its determination that the marital residence is Wife's separate property?
> 2.  In the alternative, did the trial court err, or reach an unjust result, by ordering that Husband should be responsible for a portion of the home equity line-of-credit secured by the marital residence?
> 3.  Did the trial court err in assigning to Husband a disproportionate amount of marital debt?
> 4.  Did the trial court err in the classification and repayment of funds received from Wife's father?
> 5.  Did the trial court err in finding that Wife did not dissipate assets in violation of T.C.A. § 36-4-106 during the divorce?
> 6.  Did the trial court err in finding that Wife did not fail to preserve certain rental property during the divorce?
> 7.  Did the trial court err in the manner of payment to Husband for his share in the Pickwick home?
> 8.  Did the trial court err in failing to specify values and/or valuation dates of assets and debts in the marital estate?

1.      Findings of fact by the trial court, sitting without a jury, are reviewed *de novo* with a presumption of correctness, unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d) (2012); ***Blair v. Brownson***, 197 S.W.3d 681, 684 (Tenn. 2006).  When "the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary."  ***Heffington v. Heffington***, No. M2009-00434-COA-R3-CV, 2010 WL 623629, at *2; 2010 Tenn. App. LEXIS 124, at *5 (Tenn. Ct. App. Feb. 19, 2010) (citing ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002)).  Questions of

---

[3]The trial court did not mention the $10,000 payment that Husband said was a "gift" to Blume.

law are reviewed *de novo*, with no presumption of correctness. ***Burlew v. Burlew***, 40 S.W.3d 465, 470 (Tenn. 2001); ***Williams v. Williams***, 286 S.W.3d 290, 295 (Tenn. Ct. App. 2008).

Our Supreme Court recently summarized the standard of review for the classification and division of marital property:

> The classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances. ***See Langford v. Langford***, 220 Tenn. 600, 421 S.W.2d 632, 634 ([Tenn.] 1967); ***Cutsinger v. Cutsinger***, 917 S.W.2d 238, 241 (Tenn. Ct. App.1995). This Court gives great weight to a trial court's decisions regarding the division of marital assets, and we will not disturb the trial court's ruling unless the distribution lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law. ***Keyt v. Keyt***, 244 S.W.3d 321, 327 (Tenn. 2007).

***Snodgrass v. Snodgrass,*** 295 S.W.3d 240, 245 (Tenn. 2009).

### ANALYSIS

We consider the issues raised on appeal in a sequence different from the order in which Husband presents them. First, we consider whether the trial court erred in holding that the monies given to Husband by Wife's father Blume were a loan rather than a gift. We then analyze whether the trial court erred in holding that Wife's actions with respect to the parties' rental properties did not amount to dissipation or failure to preserve marital property, and in rejecting Husband's other allegations of dissipation. After that, we will consider whether the trial court erred in classifying the High Plains home as Wife's separate property, and then the issues related to the trial court's division of the marital estate.

### Funds Received from Wife's Father

Husband argues that the cash payment of $20,000 from Blume and the pledge of Blume's $14,000 CD were improperly classified by the trial court as loans. Husband observes that Blume neither asked for nor obtained a promissory note from either party as to these two sums, even though the proof showed that Wife executed at least two promissory notes to her father for amounts that she borrowed from him during the marriage to pay her attorney fees. Husband also points out that, while the bank had asserted a claim to Blume's pledged CD,

as of the time of trial, the CD had not yet been lost, and Blume had the option of taking over the Hammond property in order to retain his CD. Husband notes that the proof showed that Blume had given the parties several other large gifts during the marriage, including the Anderson Bend home valued at $165,000.

The determination of whether an intra-family transaction is a loan or a gift is a question of fact. *Woods v. Woods,* No. M2002-01736-COA-R3-CV, 2005 WL 1651787, at *7; 2005 Tenn. App. LEXIS 409, at *21 (Tenn. Ct. App. July 12, 2005) (citing *In re Marriage of Michel*, 142 S.W.3d 912, 922 (Mo. Ct. App. 2004)). In this case, Husband and Blume gave differing accounts of whether the transactions were intended as loans or as gifts, and the trial court's factual finding on this issue turned on its assessment of their credibility. As this Court has noted, "on an issue which hinges on witness credibility, the trial court will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary." *Gentry v. Gentry*, No. E2000-02714-COA-R3-CV, 2001 WL 839714, at *3; 2001 Tenn. App. LEXIS 533, at *9 (Tenn. Ct. App. July 25, 2001) (quoting *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)). While Husband directs our attention to proof in the record that supports his position, he points to no clear, concrete and convincing evidence to contradict the trial court's decision to credit Blume's testimony on this issue. Moreover, there are undisputed facts in the record that support Wife's assertion that the monies from Blume were intended to be loans, such as Husband's subsequent "gift" to Blume of $10,000 upon a house closing, at a time when Husband's business was financially strapped and he could ill afford such a "gift." Based on our review of the record, we affirm the trial court's factual finding on this issue.

## Dissipation, Failure to Preserve Assets

In connection with Wife's handling of the parties' rental properties after they separated, Husband argues that the trial court erred in finding that Wife did not dissipate assets and did not fail to preserve marital assets. First, Husband contends that Wife violated the automatic injunction issued pursuant to Tennessee Code Annotated § 36-4-106(d)(1)(A), which prohibited Wife from spending significant marital assets without Husband's consent.[4] Husband argues that Wife's decision to spend $41,000 from investment accounts which held marital funds in an unsuccessful attempt to save the Hammond and Henrietta properties from foreclosure amounted to dissipation of marital funds.

---

[4]Husband argues this as it relates to dissipation, but there is no issue on appeal as to whether Wife should have been held in contempt of court for allegedly violating the automatic injunction.

In a related argument, Husband contends that Wife's handling of their rental properties constituted a failure to preserve marital assets. Husband argues that when Wife took over the Hammond and Henrietta properties, her inexperience in managing rental properties and her lack of attentiveness to these properties led to the foreclosure on the properties. Husband points out that the properties "survived" while they were under his care and control, and asserts that Wife's refusal to permit Husband to intervene ultimately caused the loss of the properties.

Tennessee Code Annotated § 36-4-121 provides that, in dividing the marital estate, the trial court may take into account the "contribution of each party to the . . . dissipation of the marital or separate property." Tenn. Code Ann. § 36-4-121(c)(5) (2011). In 2011, the statute was amended to include the following definition of dissipation:

> For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce . . . has been filed.

Tenn. Code Ann. § 36-4-121(c)(5)(B). The statutory definition is consistent with prior Tennessee caselaw emphasizing that the "concept of dissipation is based on waste." *Williams v. Williams*, No. E2004-02439-COA-R3-CV, 2005 WL 2205913, at *9 (Tenn. Ct. App. Sept. 12, 2005) (citing *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005) (*perm. app. denied*)). This Court has noted that actions deemed to be dissipation have typically involved "intentional and purposeful conduct that has the effect of reducing the funds available for equitable distribution." *Long v. Long,* No. M2006-02526-COA-R3-CV, 2008 WL 2649645, at * 9 (Tenn. Ct. App. July 3, 2008)(quoting *Williams,* 2005 WL 2205913, at *9). One factor to be considered in determining whether a spouse has dissipated marital property is whether the allegedly dissipating spouse "intended to hide, deplete, or divert a marital asset." *Long*, 2008 WL 2649645, at *9. As the party asserting dissipation, Husband bears the burden of proof on this issue. *Altman,* 181 S.W.3d at 682.

Under Section 36-4-121(c)(5), in dividing the marital estate, the trial court is also directed to consider the contribution of each party toward the "preservation" of marital or separate assets. Tenn. Code Ann. § 36-4-121(c)(5)(A). In *Flannary v. Flannary*, the Supreme Court defined preservation in the context of marital assets as "keeping [them] safe from harm; avoiding injury, destruction, or decay; maintenance . . . not the creation, but the saving of that which already exists, and implies the continuance of what previously existed." *Flannary v. Flannary*, 121 S.W.3d 647, 651 (Tenn. 2003) (citing *Black's Law Dictionary*, 1184-85 (6th ed. 1990)). Much like dissipation, the spouse asserting failure to preserve marital assets bears the burden of proof. *Armstrong v. Armstrong*, No. M2006-02713-COA-R3-CV, 2008

WL 624862, at *8; 2008 Tenn. App. LEXIS 132, at *21 (Tenn. Ct. App. Mar. 5, 2008) (citing *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *5; 2004 Tenn. App. LEXIS 546, at *11 (Tenn. Ct. App. Aug. 24, 2004)).

This Court's analysis in *Long v. Long,* cited above, is instructive in the case at bar. In *Long,* while the parties were separated, the husband urged the wife to consent to the sale of stock the parties owned, because the price of the stock was dropping rapidly and the husband believed that the stock's value would continue to drop. *Long*, 2008 WL 2649645, at *3. The wife refused to agree to the sale of the stock, and the stock's value dropped precipitously, as the husband had predicted. *Id.* at *5. On appeal, the husband took the position that the wife's foolish refusal to consent to the sale of the stock amounted to either dissipation of marital assets or failure to preserve a marital asset. This Court rejected his assertion:

> With benefit of hindsight, we see that Husband's prediction that the value of the BSF stock could drop was correct. Wife, however, was not required to be clairvoyant or to simply accept Husband's investment advice. Had the stock been sold and the value thereafter rose dramatically, would this amount to dissipation by Husband? In explaining her refusal to sell the BSF stock, Wife testified that she considered the stock to be a long-term investment, and there is no evidence indicating that Wife's refusal to sell was intended to deplete a marital asset, or that it was a careless wasting of marital property. Husband's argument is without merit.

*Id*. at *9.

In the instant case, the proof in the record shows that the properties at issue were problematic; the parties' property manager had advised Husband not to purchase them, but that advice was not taken. It also shows that the real estate market at the time, the fall of 2008, was highly unstable. Wife first put money into the properties in an effort to save them from foreclosure. Later, after seeking advice from her father and others, she arrived at the conclusion that foreclosure was inevitable and further efforts to stave it off would be unwise. As in *Long,* with the "benefit of hindsight," we can see that the parties may have been better off if Wife had made different choices. However, this does not mean that any of her choices constituted either dissipation or failure to preserve marital assets. *See Altman*, 181 S.W.3d at 683 ("Simple mismanagement of family finances is not dissipation, nor is using marital funds to prop up a failing business."). We affirm the trial court's findings on these issues.

Husband also argues that Wife dissipated marital assets by withdrawing monies from other investments accounts and using them to repay a loan to her father, for personal expenditures

such as excessive clothing and manicures, and to pay fees for her divorce attorney.[5] As to Wife's personal expenditures, the trial court observed that there was "no proof or testimony that [Wife's] spending habits were any different during the marriage than they were prior to the marriage when they dated and married." Our review of the record confirms this. *See Altman*, 181 S.W.3d at 683 n.5 ("It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them."). The trial court held overall that Husband had not proven that the expenditures to which he objects constituted dissipation. *See Earley v. Earley*, No. W2002-01354-COA-R3-CV, 2003 WL 22071059, at *10-11; 2003 Tenn. App. LEXIS 616, at *32-36 (Tenn. Ct. App. Aug. 26, 2003) (finding the attorney fees paid by husband in an unrelated civil suit that solely benefitted husband were not dissipation). From our review of the record as a whole, we cannot conclude that the evidence preponderates against the trial court's findings on this issue. The trial court's holding that Wife did not dissipate marital assets or fail to preserve marital assets is affirmed.

**Classification of High Plains Home**

Husband argues next that the trial court incorrectly classified the High Plains home as Wife's separate property. He contends that the home became marital property under the doctrine of transmutation, and thus should have been equitably divided as part of the marital estate. Husband relies on the fact that the parties lived together in the home for the entire six years of marriage, on the 2006 quit claim deed transferring title from Wife individually to Wife and Husband as tenants by the entirety, and on Wife's testimony at trial that when the parties married, she believed that "when you are married, everything is together." Husband emphasizes the contributions that he made to the home, financial and otherwise. He notes his financial contributions to the joint account from which the mortgage was paid in the first two years of marriage. Husband also points out that even after Wife began making the mortgage payments out of her separate account, the mortgage payments were made from income Wife earned during the marriage. Husband emphasizes his non-financial contributions to the High Plains home, in the form of improvements to the home. These included the removal of carpet; pouring, staining, and scoring concrete in the home; repainting the interior of the home; replacing the pool pump; maintaining the sprinkler

---

[5]Wife testified that she had no way to pay her attorney at the time, James Arthur, the $20,000 he required except by withdrawing from the investment accounts, even though it violated the statutory injunction against spending significant marital funds without the consent of the other spouse. She said that she explained this to Mr. Arthur before making the withdrawals, and he replied, "You have to do whatever you have to do." At trial, Mr. Arthur acknowledged having said this to Wife after advising her of the consequences for violating the injunction and that he would not work without being paid, leaving the ultimate decision to her. In February 2009, Mr. Arthur withdrew as Wife's counsel based on their interests becoming adverse to the point where he could not effectively represent her.

system; yard maintenance; replacement of kitchen facets; replacement of light fixtures; repairing sheet rock; and repairing a fence.

In response, Wife maintains that Husband made no significant contribution to the preservation and maintenance of the High Plains home. Wife cites several cases in which the court held that an increase in the value of separate property during the marriage should be considered marital property only if the non-owner spouse made a substantial contribution. Wife points out that she paid the mortgage, the utilities, the homeowner's insurance, the annual property taxes, and paid for cleaning and maintaining the residence and the pool.[6] She argues that Husband did not pay the mortgage, cut the grass, maintain the pool, or pay for the cleaning service. As such, Wife maintains, Husband is not "entitled to any portion of [the High Plains] home as a division of marital property."

Our Supreme Court has explained why the classification of the parties' property is key to the equitable division of property in a divorce case:

> Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property." ***See generally*** Tenn. Code Ann. § 36–4–121; ***Eldridge v. Eldridge***, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002). When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. Tenn. Code Ann. § 36–4–121(a)(1). "Separate property" is not part of the marital estate and is therefore not subject to division. ***See Cutsinger*** [***v. Cutsinger***], 917 S.W.2d [238,] 241 [Tenn. Ct. App. 1995]. Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

***Snodgrass v. Snodgrass,*** 295 S.W.3d 240, 246 (Tenn. 2009). Broadly speaking, "separate property" is "[a]ll real and personal property owned by a spouse before marriage. . . ." Tenn. Code Ann. §36-4-121(b)(2)(A). "Marital property" is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . ." Tenn. Code Ann. § 36-4-121(b)(1)(A).

"[S]eparate property can become part of the marital estate due to the parties' treatment of the separate property." ***Eldridge v. Eldridge***, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002). Depending on how the property is treated, separate property can become marital property

---

[6]Wife's appellate brief fails to cite to the record to support these assertions.

either through the doctrine of commingling or through the doctrine of transmutation. ***Id.*** The related doctrines of commingling and transmutation were explained in ***Langschmidt v. Langschmidt***:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

81 S.W.3d 741, 747 (Tenn. 2002) (quoting 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)); ***see Batson v. Batson***, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988). ***See also Snodgrass,*** 295 S.W.3d at 256.

Joint ownership of a marital residence, even one that was a spouse's separate property prior to the marriage, gives rise to a presumption that the property is marital, not separate. ***Fox v. Fox***, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5; 2006 Tenn. App. LEXIS 591, at *17-18 (Tenn. Ct. App. Sept. 1, 2006) (citing ***Eldridge***, 137 S.W.3d at 14; ***Smith v. Smith***, 93 S.W.3d 871, 878 (Tenn. Ct. App. 2002); ***Wright-Miller v. Miller***, 984 S.W.2d 936, 941 (Tenn. Ct. App. 1998); ***Kincaid v. Kincaid,*** 912 S.W.2d 140, 142 (Tenn. Ct. App. 1995)). The presumption created by joint ownership is not always controlling and can be overcome by evidence of contrary conduct by the parties and the manner in which the parties themselves treat the property. ***Fox***, 2006 WL 2535407, at *5; 2006 Tenn. App. LEXIS 591, at *18 (citing ***Alford v. Alford***, 120 S.W.3d 810, 813 (Tenn. 2003); ***Langschmidt***, 81 S.W.3d at 747; ***Cohen v. Cohen***, 937 S.W.2d 823, 833 n.12 (Tenn. 1996); ***Altman***, 181 S.W.3d at 680-81).

This Court has outlined common factors considered when determining whether a home owned by one spouse prior to marriage should be deemed marital property:

> Four of the most common factors courts use to determine whether real property has been transmuted from separate property to marital property are: (1) the use of the property as a marital residence; (2) the ongoing maintenance and

management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property. Accordingly, our court has classified separately owned real property as marital property when the parties agreed that it should be owned jointly even though the title was never changed, or when the spouse owning the separate property conceded that he or she intended that the separate property would be converted to marital property.

*Fox*, 2006 WL 2535407, at *5; 2006 Tenn. App. LEXIS 591, at *18-19 (citing ***Cronin-Wright v. Wright***, 121 S.W.3d 673, 675 (Tenn. Ct. App. 2003); ***Robertson v. Robertson***, No. M1999-02103-COA-R3-CV, 2001 WL 459100, at *3; 2001 Tenn. App. LEXIS 319, at *8-10 (Tenn. Ct. App. May 2, 2001)).

In its ruling, the trial court below found that the quit claim deed titling the High Plains home in the parties' joint names was not determinative because the "sole purpose of the quit claim deed was to facilitate a loan for [Husband], which was used for one of his many businesses. . . ." We agree with this part of the trial court's reasoning. The undisputed evidence about the reason Wife executed the quit claim deed rebuts any presumption stemming from the parties' joint ownership of the High Plains home.

However, by the time Wife executed the quit claim deed, the High Plains home had already become marital property via the doctrine of transmutation. Of course, the High Plains home started out as Wife's separate property, since Wife owned it in her sole name prior to the marriage. However, Wife herself testified at trial that, when the parties married, she opened a joint bank account to pay the mortgage because she believed at the time that "when you are married, everything is together" and that she intended for the expenses associated with the High Plains home to be "a joint thing." Even if Husband's financial contributions to the joint account were minimal, once funds were deposited in the account from any source, they were owned by the parties jointly. For several years, the mortgage payment on the High Plains home was paid from this joint account. The parties, of course, lived together in the High Plains home throughout their marriage. Husband consistently made significant improvements to the home. Both parties borrowed monies from the equity in the home. While no one factor is determinative, all of this considered together is "evidence of an intention that [the High Plains home] become marital property." ***See Langschmidt,*** 81 S.W.3d at 747. All of this evidence indicates an intent by the parties, at least in the first few years of the marriage, to hold the High Plains home as marital property. Later, as the parties' relationship soured, Wife retrenched and took steps such as separating the parties' bank accounts. By then, however, the home had become marital property under the doctrine of transmutation.

Under all of these circumstances, we must conclude that the evidence in the record preponderates against the trial court's finding that the High Plains home remained Wife's separate property. We hold that the evidence preponderates in favor of a finding that the High Plains home became marital property and should have been included in the parties' marital estate for purposes of the trial court's division of property.

The High Plains home is a significant asset, and its addition to the marital estate may change the manner in which the trial court would choose to divide the rest of the parties' assets and debts. Therefore, we deem it prudent to remand the case to the trial court for reconsideration of its equitable division of the marital estate in light of our holding on the High Plains home. This holding pretermits the remaining issues raised by Husband on appeal.

One note is in order. In the trial court's final order, it valued the parties' Anderson Bend property by referring to certain tax assessor valuations, rather than by a dollar amount. We did not find the referenced tax assessor valuations in the appellate record. Frankly, this Court struggled with whether this rendered the trial court's order not final for purposes of our jurisdiction over this appeal. Ultimately, we determined that it did not, but we also note that, had the issues regarding the Anderson Bend property not been pretermitted by our decision to remand the case for reconsideration of the division of marital property, we likely would have had to remand the case to the trial court for clarification and more complete, explicit findings, *i.e.*, dollar amount valuations. Accordingly, on remand, it is our fond hope that the trial court will remedy this in its final order, to avoid remand in any future appeal.

## CONCLUSION

The decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs on appeal are assessed one-half against Appellant Jeffery Charles Hayes and his surety, and one-half against Appellee Melissa Marie Hayes, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE