IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 10, 2024 Session

## CATHERINE WOLTE PALLEKONDA v. VINAY ANAND RAJ PALLEKONDA

**Appeal from the Chancery Court for Madison County**
**No. 80236     Steven W. Maroney, Chancellor**

———————————————————

**No. W2023-00574-COA-R3-CV**

———————————————————

In this divorce action, the husband appeals the trial court's division of the marital estate, its determination that he was underemployed, and the wife's awards of alimony. For the reasons stated herein, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Andrea D. Sipes, Jackson, Tennessee, for the appellant, Vinay Anand Raj Pallekonda.

Lara E. Butler and Elizabeth W. Fyke, Memphis, Tennessee, for the appellee, Catherine Wolte Pallekonda.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

The parties to this divorce case are Catherine Wolte Pallekonda ("Wife") and Vinay Anand Raj Pallekonda ("Husband"). Wife and Husband, who are both in their 50s, were married for nearly twenty years at the time of their divorce. Inasmuch as the present appeal is more or less limited to financial matters between the parties, we will tailor our discussion accordingly.[1]

---

[1] Although, as noted herein, two children were ultimately born of the marriage, neither custody nor parenting time issues are in dispute in this appeal.

Wife previously worked as a registered nurse in the early years of the marriage, but she has not worked in that capacity since the mid-2000s based upon a mutual decision by the parties. At the time Wife left the workforce, she had an ill father and was also pregnant with the parties' first child. Two children were ultimately born of the marriage, including one child who has special needs.

While Wife served as a homemaker and caregiver for the parties' children for the majority of the marriage, Husband pursued a lucrative career as a physician.[2] During certain periods of his career, Husband engaged in moonlighting adjacent to his primary work, and of further note, during certain stints of his employment, he had specifically served as a medical executive while also doing clinical work. Husband's salary earnings reached their zenith in 2020, when he earned over $700,000.00. In the two years prior, both in 2018 and 2019, he earned over $600,000.00. Husband had also earned over $600,000.00 in 2015, while earning slightly under $590,000.00 in both 2016 and 2017.

The record reflects that Husband's demonstrated ability to earn this high income as his career progressed was something that specifically animated his employment decisions during the marriage. For instance, while the parties were living in Michigan, Husband was presented with an opportunity to become the chief medical officer for a particular health care provider. Although the executive position for that provider paid significantly lower than what Husband had then been earning, Husband pursued additional clinical work to make up the difference. As he explained at the trial of this matter, he had an executive contract with one health provider and a separate contract to do clinical work for another. He testified that he had pursued these dual opportunities in order to, as he put it, still "keep me at the 600 [thousand dollar earnings] I was [at in my prior position]."

In 2020, amidst the COVID pandemic, the parties decided to relocate to Tennessee. In connection with the parties' move, Husband accepted employment as the chief medical officer at West Tennessee Healthcare in Jackson. Although, per Husband's testimony, his executive contract in this position provided for a salary of $425,000.00 a year, he also had a separate contract to do clinical work in Jackson for an extra $200,000.00 annually. Concerning this, Husband testified, as before, that he "wanted to stay in that 600 [thousand dollar earnings] what I was [at]."

In addition to his primary work in Jackson, Husband moonlighted by traveling back to Michigan to do further clinical work, often going on weekends. He testified that this was "[s]ometimes . . . once a month" and "[s]ometimes it was more than once a month." According to Wife's testimony, working on the weekends to make money was something that Husband had "always done."

---

[2] Per Husband's curriculum vitae, he has served in various roles during his career, including as a clinician, medical director, and professor. His curriculum vitae further reflects that he has had board certifications in anesthesiology, internal medicine, and critical care medicine.

Husband's employment in Jackson was short-lived. According to the record, he was employed at West Tennessee Healthcare for less than a year when he was asked to leave.[3] Subsequently, during the pendency of this divorce case, Husband accepted employment as the chief medical officer for a hospital in Florida. Through this Florida employment position, Husband earns $320,000.00 annually. He is also eligible for a bonus through his employment, and per his offer letter for the Florida position, Husband is specifically eligible to participate "in the Company's Incentive Plan . . . at an annual target of 25%" of his annual base salary.

The litigation between the parties began when Wife filed a complaint for divorce in the Madison County Chancery Court ("the trial court") in April 2021. Husband filed an answer and counterclaim the following month, and during the pendency of the litigation, the trial court ordered that Husband pay Wife monthly temporary spousal support in the amount of $13,000.00. The case was later tried in January 2023.

Following trial, the trial court entered a final decree of divorce pursuant to which Wife was granted a divorce on the ground of inappropriate marital conduct. In addition to granting Wife a divorce and dividing the parties' marital estate,[4] the trial court concluded in the final decree that "Husband could likely earn more than he is presently earning whether he works in an executive capacity or clinical capacity." According to the trial court, Husband's earning capacity was $36,000.00 per month. After considering this and a number of other factors, including the fact that the parties' mutual decision for Wife to leave the workforce had created an impediment for her to recognize the earning capacity she might have otherwise enjoyed, the trial court awarded Wife transitional alimony in the amount of $9,000.00 a month for seventy-two months and, thereafter, $7,000.00 a month as alimony in futuro. This appeal followed.

**DISCUSSION**

Through his appellate brief, Husband has raised three issues for our review. First, Husband contends that the trial court erred by finding him willfully and voluntarily underemployed. Second, Husband submits that the trial court should have awarded Wife rehabilitative alimony as opposed to the transitional and in futuro alimony awards that were given. As a final issue, Husband argues that the trial court failed to equitably divide the marital estate.

---

[3] As testified to by Husband, his departure from West Tennessee Healthcare occurred during the pendency of the divorce. Indeed, Husband stated that the day before he was called into the HR office, there was an "emergency COVID meeting" but that he had not attended because he had "[e]ither . . . met with my attorney or something to do with the divorce."

[4] Notwithstanding the sizeable income realized by the parties during the years leading up to their divorce—but suggestive of the high standard of living they enjoyed from that income—the total marital estate itself was valued by the trial court at approximately $415,000.00.

Of note, Husband's counsel expressly waived the property division issue at the opening of her presentation during oral argument before this Court. In light of counsel's representation, we consider the property division issue waived and restrict our discussion herein to the raised issues concerning Husband's underemployment and Wife's alimony awards.

*Husband's Underemployment and Earning Capacity*

There is no question in this case that Husband's income in Florida was much lower than he had previously earned in the years leading up to the parties' divorce. Although Husband earns an annual base salary of $320,000.00 at his current employment in Florida, which translates to approximately $26,666.67 monthly,[5] the trial court concluded that he "could likely earn more" and ultimately determined that his earning capacity was $36,000.00 per month.[6] As part of its findings, the trial court noted that Husband had "allowed his credentialing and board certifications to lapse without taking steps to remedy same such that he could be capable of earning more," and whereas Husband had, among other proffered justifications, stated that his current employer placed limitations on his ability to do clinical work, the court stated that "it has been clearly demonstrated that other employers for which Husband previously worked allowed Husband to work in an executive capacity and also do clinical work." As discussed below, the trial court's order ultimately reflects that it rejected Husband's contention concerning his claimed inability to perform clinical work as he did during the marriage.

In determining Husband's earning capacity to be $36,000.00 per month gross, the trial court considered what he had previously earned over the course of a prior defined decade[7] and noted that this "ten-year average" resulted in a monthly income of $40,996.50. The trial court also considered, referencing its reliance on Husband's testimony, that Husband's historical average earnings as a chief medical officer alone were $32,500.00 per month.

Husband has now appealed to this Court arguing that the trial court erred by finding him willfully and voluntarily underemployed. We preface our engagement with this issue with a point of instruction by observing that Husband's argument itself is technically subject to waiver for noncompliance with applicable briefing requirements. Very simply, the argument section included in Husband's brief provides no citations to the record in support of the various factual assertions included therein as required by Rule 27 of the Tennessee Rules of Appellate Procedure and Rule 6 of the Rules of the Court of Appeals

---

[5] If Husband earns the 25% bonus available to him per his offer letter, his income would be $400,000.00 annually, which translates to approximately $33,333.33 monthly.

[6] In relative terms, this determined earning capacity was slightly higher than the $33,333.33 average monthly compensation available to Husband if his 25% bonus opportunity is taken into account.

[7] The trial court looked at the years 2012-2022 but excluded 2021 upon noting that Husband then "did not work full time."

of Tennessee. *See* Tenn. R. App. P. 27(a)(7) (providing that the argument of the appellant's brief shall include "appropriate references to the record . . . relied on"); Tenn. Ct. App. R. 6(b) ("No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded."). In any event, as discussed below, we are of the opinion that Husband's asserted grievance does not warrant relief even when the issue is considered on its merits.

Husband initially states in his argument that the trial court made a finding that he did not leave his prior employment in Jackson voluntarily. Although this is no doubt true, such a finding did not restrict the trial court from concluding that Husband was willfully underemployed in this case. Indeed, as we previously discussed concerning such an issue and the matter of underemployment more generally:

> The determination of whether a parent is willfully and/or voluntarily under or unemployed presents a question of fact. *See Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). In non-jury cases, findings of fact are presumed to be correct unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d). . . . We will not overturn a trial court's assessment of credibility on appeal absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

> The [Child Support] Guidelines do not presume that a parent is willfully underemployed. TENN. COMP. R. & REGS. 1240–02–04–.04(3)(a)(2)(ii). The trial court must "ascertain the reasons for the parent's occupational choices, and . . . assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and . . . determine whether such choices benefit the children." *Id.* So the "complete factual background of the obligor's situation" is relevant. *Ralston v. Ralston*, No. 01A01–9804–CV–00222, 1999 WL 562719, at *5 (Tenn. Ct. App. Aug. 3, 1999).

> The Guidelines include a list of nonexclusive factors that may be considered in making a determination of willful and/or voluntary underemployment or unemployment. Pertinent to this appeal, the fact finder may consider "[t]he parent's past and present employment" and "[t]he parent's education, training, and ability to work." TENN. COMP. R. & REGS. 1240–02–04–.04(3)(a)(2)(iii)(I), (II).

> Courts often begin their analysis with the circumstances under which the parent left his previous employment. *Eldridge*, 137 S.W.3d at 21. "When a party with child support obligations voluntarily leaves their employment and chooses to accept a job which provides significantly less income, courts are more inclined to find willful and voluntary underemployment." *Id.*; *see,*

*e.g.*, *DeWerff v. DeWerff*, No. M2004–01283–COA–R3–CV, 2005 WL 2104736, at *4 (Tenn. Ct. App. Aug. 31, 2005) (affirming finding that the father was voluntarily underemployed when he "voluntarily chose to abandon a successful legal practice in order to relocate to another state for purely personal reasons"); *Willis v. Willis*, 62 S.W.3d 735, 738–39 (Tenn. Ct. App. 2001) (affirming determination that the father was voluntarily underemployed when he changed jobs because he was dissatisfied); *Watters v. Watters*, 22 S.W.3d 817, 823 (Tenn. Ct. App. 1999) (affirming finding of voluntary unemployment when the father quit his job rather than accept a lateral transfer).

Next, the court scrutinizes the parent's subsequent course of conduct. *Eldridge*, 137 S.W.3d at 21. This scrutiny includes an examination of whether the parent made a good faith effort to replace their lost income. *Id.*; *see, e.g.*, *Sitz v. Sitz*, No. E2012–01726–COA–R3–CV, 2013 WL 5450416, at *10 (Tenn. Ct. App. Sept. 30, 2013) (affirming finding of voluntary underemployment when the husband worked only sporadically at jobs that did not use his education, skills, or experience and only submitted seven written job applications in two years); *Kaplan v. Bugalla*, No. M2006–02413–COA–R3–CV, 2007 WL 4117787, at *5 (Tenn. Ct. App. Nov. 16, 2007) (noting that the father limited his job search to online inquiries and failed to make any additional efforts to find new employment); *Demers*, 149 S.W.3d at 72 (affirming finding of voluntary underemployment in part because the father failed to take affirmative steps to find regular employment commensurate with his skills).

. . . .

**On appeal, Father makes much of the fact that he did not leave his previous job voluntarily. But involuntary loss of a job does not preclude a finding of willful or voluntary underemployment.** *State ex rel. Ledbetter v. Godsey*, **No. M1998–00958–COA–R3–CV, 2000 WL 798641, at *5 (Tenn. Ct. App. June 22, 2000). A parent's "course of action and decision-making after termination can demonstrate willful and voluntary underemployment."** *Id.* That was true in this case.

*Goodrich v. Goodrich*, No. M2017-00792-COA-R3-CV, 2018 WL 1976108, at *2-4 (Tenn. Ct. App. Apr. 26, 2018) (emphasis added).

Here, the trial court was presented with evidence that Husband had allowed certain credentialing and board certifications to lapse,[8] and as noted earlier, the court found that

---

[8] At trial, Husband specifically acknowledged that his "anesthesiology boards lapsed probably

he specifically did so "without taking steps to remedy same such that he could be capable of earning more." Husband also specifically testified as follows during the trial: "I do not want to work like I was working before." To be sure, the trial court's order actually disclaims any expectation that Husband could earn what he earned at the peak of his earnings in 2020 during COVID. Yet, in light of the general testimony from Husband about not wanting to work like before,[9] the concomitant reductions in his earnings as illustrated by the evidence, his past work history and long track record of high prior earnings, Husband's allowance of certain credentials and certifications to lapse, the fact that Husband is in his early 50s, and the trial court's apparent rejection of Husband's testimony that he could not work clinical hours and had limited opportunities following his employment in Jackson,[10] the evidence does not preponderate against the trial court's determination that Husband is willfully and voluntarily underemployed.

### Wife's Alimony Awards

We next turn to Husband's contention that the trial court's awards of alimony were in error and that Wife should have simply received rehabilitative alimony.[11] In considering this issue, we review the trial court's actions for an abuse of discretion. Indeed, as we have explained before:

Alimony determinations are inherently factual in nature and require the trial

---

within the last year."

[9] In addition to Husband's testimony, Wife testified that when she and Husband discussed how the pay for Husband's job in Florida was much lower, she claims she asked Husband why he did not just go back to Michigan where the parties had previously been, to which Husband allegedly said "he didn't want to."

[10] The trial court's order in this case specifically outlines the various reasons Husband "proffered for [his] limited employment opportunities" and his decreased earnings after his departure from Jackson, and given the trial court's ultimate imputation of income to Husband relative to this issue, it is evident that the trial court did not find him credible on such matters. Of particular note, moreover, we observe that when Husband discussed his decision to allow his anesthesiology board certification to lapse, he attributed his action, in part, to his claimed inability to perform clinical work. The trial court expressly noted that Husband's reasons for allowing his credentialing and certifications to lapse "aren't particularly persuasive." Further, regarding Husband's prior practice of moonlighting by working clinical hours and the prospect for such continued moonlighting outside of his Florida hospital position, it should be noted that Husband's counsel acknowledged at oral argument that it was not clear where Husband drew the conclusion that he would be terminated if he engaged in moonlighting outside of the hospital. Although counsel suggested that Husband appeared to, in part, base his belief on his employment contract, counsel readily acknowledged that such a restriction is *not* present. The absence of such a prohibition was confirmed by Husband's boss, who also testified that Husband had never asked about his ability to moonlight.

[11] As with the prior issue we examined, the argument section of Husband's brief on this issue fails to contain appropriate references to the record to support the factual contentions included therein, and given this noncompliance with applicable briefing requirements imposed by the Tennessee Rules of Appellate Procedure and the Rules of the Court of Appeals of Tennessee, this issue is technically subject to waiver. In any event, having nonetheless considered the issue on the merits, we, as discussed herein, fail to discern any error on the part of the trial court.

court to balance many factors. Our role is only "to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." We are to presume the correctness of the trial court's decision and review the evidence "in the light most favorable to the decision." An abuse of discretion review must reflect "an awareness that the decision being reviewed involved a choice among several acceptable alternatives." Thus, the fact that the reviewing court would not have made the same ruling is not relevant as long as the trial court's decision falls within the range of acceptable options.

*Forbess v. Forbess*, 370 S.W.3d 347, 356–57 (Tenn. Ct. App. 2011) (internal citations omitted).

The Tennessee Code specifically instructs that the following factors shall be considered by trial courts when determining the nature, amount, length of term, and manner of payment of any alimony awarded:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are

necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). Without question, the two most important factors are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. *Henry v. Henry*, No. M2019-01029-COA-R3-CV, 2020 WL 919248, at \*6 (Tenn. Ct. App. Feb. 26, 2020).

In his argument section on this issue, Husband appears to focus his argument on Wife's need and, in suggesting that an award of rehabilitative alimony alone would be sufficient in this case, alleges that "Wife could rehabilitate herself." Having reviewed the record, and as discussed further below, we discern no error in the manner in which the trial court crafted its spousal support awards, which provide Wife with an initial period of support in adjusting to the economic consequences of divorce followed by continued support thereafter through the court's in futuro award.

In explaining the basis for its decision pursuant to its consideration of the statutory factors from section 36-5-121(i), we note that the trial court appropriately highlighted the following considerations:

- Husband has a high earning capacity.
- The parties enjoyed a high standard of living throughout the marriage.
- The parties jointly decided for Wife "to leave the workforce approximately twenty (20) years ago to care for and raise the parties' children, one of whom subsequently developed special needs which created an additional impediment for Wife to fully recognize the earning capacity she might have otherwise enjoyed had she not left the workforce."
- Husband is in a "far superior" position in terms of the parties' relative earning capacities.
- Husband's education and training are superior in comparison to Wife.
- The parties' marriage was a long-term one.
- Both parties are in their early 50s, and both are capable of working.
- Although Wife has had to care for the parties' child with special needs, that child "does not require 24/7-type monitoring."
- Both parties made contributions to the marriage, i.e., "Husband's financial contributions and Wife's management and preservation of the home contributions."
- Husband was guilty of inappropriate marital conduct in this case.

The trial court also noted that it had considered the division of property in this case.

Although Husband suggests that an award of rehabilitative alimony alone would have been sufficient here, we are of the opinion that his assertions that the trial court erred are without merit. We initially take heed of the following direction provided by the

- 9 -

Tennessee Code:

> To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(e)(1). Further, in outlining the specific context in which alimony in futuro may be awarded, the Code notes that such long-term support is available in instances where

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(f). The record here certainly supports the notion that Wife will be unable to achieve the post-divorce standard of living expected to be available to Husband, and as such, it is no surprise that Husband has failed to cite to any evidence in the record showing how Wife would be able to be rehabilitated within the meaning of the statutory provisions referenced above. In light of this fact, and in light of the considerations cited by the trial court in reference to Tennessee Code Annotated section 36-5-121, we not only find no error in the court's failure to limit any support given to an award of rehabilitative alimony, we also, as signaled previously, discern no abuse of discretion in the manner in which the trial court crafted spousal support for Wife. Of particular note, this case is marked by Husband's high income, and although Wife is certainly capable of earning some income per the trial court's findings, she clearly is not in the same economic ballpark as Husband. Considering this and all of the other factors referenced by the trial court, including the past decision by the parties for Wife to exit the workforce to care for the children, the long-term nature of the marriage and Husband's fault in its demise, and the high standard of living the parties enjoyed, it was an entirely acceptable decision on the part of the trial court to conclude that Wife not only needed support in adjusting to the economic consequences in the immediate wake of the divorce[12] but also that a subsequent

---

[12] Another consideration cited by the trial court, the property division involved in this case, is also worthy of specific comment here. As referenced in an earlier footnote in this Opinion, the total marital estate was valued by the trial court at approximately $415,000.00. Relative to the income earned during the marriage and concomitant opportunity for the accumulation of significant wealth, this is a relatively modest sum, but again, perhaps one that is suggestive of the high standard of living the parties enjoyed during the marriage. Husband's testimony, at one point, actually alludes to the lack of accrual of significant

award of in futuro support was proper. Thus discerning no error in connection with this issue, we affirm the judgment of the trial court.[13]

## CONCLUSION

In light of the foregoing discussion, we affirm the judgment of the trial court and remand the case for such further proceedings that are necessary and consistent with this Opinion.

_____s/ Arnold B. Goldin_____
ARNOLD B. GOLDIN, JUDGE

---

wealth—relative to his earnings—over the course of the marriage. Of note, when Husband testified concerning how the parties' finances were handled during the marriage, he stated, "I mean, the kind of money that was generated, there's hardly anything in retirement savings. There's no properties. And there's nothing set up for the kids' college tuition." The size of the marital estate is notable inasmuch as this is not a case where Wife, even though receiving a greater share of the estate than Husband, is receiving an exorbitant amount of assets so as to meet her needs.

[13] In closing our discussion in this Opinion, we note that Wife includes a boilerplate request for "her attorney fees on appeal" in her brief's conclusion section. Wife has not, however, otherwise raised an issue concerning appellate attorney's fees. As such, we consider the matter waived. *See Gergel v. Gergel*, No. E2020-01534-COA-R3-CV, 2022 WL 1222945, at *46 (Tenn. Ct. App. Apr. 26, 2022) ("Husband has requested attorney's fees on appeal in the conclusion of his principal brief and reiterated the request in his reply brief while acknowledging that he did not raise the issue in his statement of issues. We determine Husband's request for attorney's fees on appeal to be waived."). The matter is also waived given that Wife failed to include any argument in support of her request for fees. *See Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (noting that an issue is waived where it is raised without any argument regarding its merits).